IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 91-6272
_____


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JIMMY HICKS, JERRY CANTY,
and LATONYA MOORE,


Defendants-Appellants


_____

Appeal from the United States District Court
for the Southern District of Texas
_____
( December 23, 1992)

Before KING, JOHNSON and DUHé, Circuit Judges.

KING, Circuit Judge:

Appellants, passengers aboard a commercial airline flight from Jamaica to Houston, were convicted of "intimidating" members of the flight crew "so as to interfere with" the performance of their duties, in violation of 49 U.S.C. § 1472(j).  Appellants raise a number of claims on appeal, most notably a first amendment challenge to § 1472(j).  After carefully considering all their claims, we affirm.

**I.**

Appellants Jimmy Hicks and Latonya Moore, who were traveling companions, boarded Continental Airlines Flight 1919 in Montego Bay, Jamaica on July 23, 1991. The flight, carrying approximately 145 passengers, was bound for Houston. Hicks carried on board a "boombox," a portable stereo system consisting of an AM-FM radio, a tape player, and speakers. Immediately after boarding and taking a seat, Hicks discovered that his seat was malfunctioning, which prevented him from sitting next to Moore. Hicks subsequently requested that Melissa Bott, the aircraft's flight service manager, find alternative seating for them. Bott responded that she could do so only after everyone with pre-assigned seating had claimed their seats. Hicks expressed his displeasure with Bott's response by using the expletive "shit." Rather than following Bott's instructions, Hicks immediately proceeded to procure alternative seating by offering another passenger free drinks in exchange for his seat. Also, during this time, Bott observed Hicks remove a newspaper from another passenger's lap. The passenger -- a total stranger to Hicks -- protested that he had not yet finished reading the paper. Hicks angrily threw the paper back at the other passenger. Bott said that she was "alarm[ed]" by Hicks' extreme arrogance.

Shortly thereafter, still prior to take-off, Moore turned on the radio component of the boombox. Bott testified that the radio was playing "loud[ly]." Bott immediately approached Moore

2

and informed her that Federal Aviation Administration (FAA) regulations prohibited the playing of radios on board aircraft because radio-playing interferes with the proper functioning of a plane's navigational equipment.  Moore agreed to turn the radio off -- but only for the time being, as later events would prove.

Following take-off, one of the flight attendants, Eileen DuBois, heard loud music playing on the aircraft; she noticed that Hicks and Moore once again were playing their boombox. After DuBois approached Hicks, he claimed that he was playing an audio tape rather than the radio.  DuBois informed him that Continental policy required that passengers may only listen to tape players through headphones.  Hicks angrily refused to turn off the machine, claiming that all of the passengers seated within listening range desired to hear his tape.  Hicks' claim was in fact somewhat unfounded.[1]  Rather than confronting Hicks any further, DuBois believed that the wisest course was to inform her superior, Melissa Bott, of Hicks' refusal to use headphones. Bott subsequently entered the cockpit to apprise the captain of the situation.

The captain instructed Bott to order Hicks and Moore to discontinue use of the boombox.  The captain stated that he believed that the playing of the radio was the cause of the malfunctioning of aircraft's navigational equipment during the

---

[1] Sibok Kim, his wife, and his two children were seated two rows immediately behind Hicks.  Kim testified that neither Hicks nor Moore ever asked the Kim family whether they wished to hear the music.

plane's ascension to cruising altitude.  Prior to Bott's entry into the cockpit, the captain and his first and second officers had attempted in vain to determine why the navigational equipment had failed, including running internal tests on the equipment, contacting a nearby American Airlines aircraft to inquire if it was experiencing similar difficulties, and contacting the airport in Jamaica to see if the malfunctioning was the result of a problem in the air traffic control tower.  By the time Bott informed him of appellants' radio-playing, the captain had already concluded that the source of the problem was within the aircraft, although not equipment-related.  Bott's report about the boombox strongly suggested that Hicks and Moore had continued to play the radio after being instructed not to do so.

Before Bott returned to the portion of the aircraft occupied by Hicks and Moore, another flight attendant, Carol McWilliams, approached them after other passengers complained about the boombox.  McWilliams informed Hicks that he must not play the radio -- as it would interfere with the plane's navigational equipment -- and that if he played a tape he must use headphones.  Hicks responded that McWilliams was "the third bitch" who had complained about the boombox.  He also angrily ordered her to serve him a drink.  At that point, Moore interjected that all of the passengers around them wished to hear the boombox.  Like DuBois before her, McWilliams realized that Hicks and Moore were too obstinate to reason with; the flight attendant thus went to the front of the aircraft to inform Bott.  As McWilliams walked

4

up the aisle, she met Bott, who was coming from the cockpit. McWilliams informed Bott of Hicks and Moore's continued non-compliance.

Bott again approached Hicks and Moore. She requested that they should turn the boombox over to her for the remainder of the flight. Hicks responded that the "f---ing radio was going to stay on" and that he would not relinquish it to anyone. In a confrontational manner, he then passed it to Moore and stated "if you want the radio, you need to get it from her." Moore also refused to give up the boombox and cursed at Bott. Moore firmly stated that "the radio is going to stay on," and ordered Ms. Bott to get her "ass[] back there and do [her] job to get them something to eat and drink." She also ordered the flight attendants to "quit bothering" them. At this point, Appellant Canty, who was seated nearby but who was not a traveling companion of Hicks and Moore, intervened and began to curse at Bott and McWilliams. No member of the flight crew had heretofore directed any comment to Canty. Bott stated that she asked appellants not to use profanity, as young children were seated nearby. Bott also stated that she began to feel "frightened" by appellants' increasingly angry obstinacy, although all the while she maintained her composure.

Bott returned to the cockpit to inform the captain of the latest developments in the escalating disturbance. At that point, the captain instructed his second officer to attempt to retrieve the boombox. In the meantime, McWilliams had another

5

encounter with Hicks and Moore, although this time Canty again vocalized his own angry sentiments to the flight attendant. McWilliams directed appellants' attention to a Continental Airlines flight magazine wherein the proscription on radio playing and the requirement that a tape player could be played only with headphones were clearly set forth. Canty angrily responded that McWilliams should "get out of [his] face."

Shortly thereafter, the second officer, Jim McKelvain, arrived and informed Hicks and Moore that their radio had interfered with the aircraft's navigational equipment. He asked them to relinquish the boombox. Hicks told the second officer "to get f---ed" and that Hicks would rather pay a fine than cooperate. The second officer described Hicks as totally "uncooperative," even after being told that he was violating federal law. As he had done when confronted with Bott's demand to turn over the boombox, Hicks proceeded to pass it to Moore. Moore refused to hand it over to the second officer, even after the officer stated that rather than confiscating it, he would merely place it in the overhead compartment located above Hicks and Moore.

Hicks then instructed the second officer to get his "mother-f---ing ass to the cockpit" and fly the plane. The second officer returned to the cockpit and informed the captain of his belief that physical force would be required to retrieve the boombox. Meanwhile, Bott was making a last ditch effort to explain to Hicks and Moore that they were violating federal law.

6

Moore stated that she did not care and that she was going to keep the boombox in her possession. Hicks stated that all of the passengers around him wished to hear the radio and that he did not care about a "f---ing" fine; in fact, he claimed, he would "buy the f---ing airplane." According to Bott, Hicks' countenance was extremely menacing. Furthermore, Canty "kept turning around and saying things the whole time I kept trying to talk to Miss Moore or Mr. Hicks." Among other things, Canty angrily stated "f--- you bitch" to Bott and told her to leave Hicks, Moore, and Canty alone. Bott also stated that the volume of the boombox was intentionally increased. Without identifying particular passengers, Bott also stated that "[a]t that point everyone around them . . . were laughing" and that someone began to videotape Bott with a portable camera.

Bott and McWilliams testified that, because of the disturbance, for a significant amount of time numerous members of the flight crew were unable to perform their regular duties aboard the aircraft. Bott, McWilliams, and Dubois also stated that they were very much intimidated by Hicks, Moore, and Canty. At one point during her efforts to retrieve the boombox, Bott testified, she felt the need visually to locate fire extinguishers to use in her defense in the event that she was physically assaulted by any or all of the three passengers. Bott also stated that numerous passengers seated around the disturbance had expressed their fear "that a riot . . . might break out."

7

Realizing that further efforts to retrieve the boombox would be futile -- short of physical force -- the captain diverted the aircraft's course to Cancun, Mexico, where an unscheduled landing occurred. The captain stated that he was unwilling to order the crew members to attempt to retrieve the boombox by physical force. He was also unwilling to risk the possibility that further radio playing would again interfere with the aircraft's navigational equipment. Upon landing, Mexican authorities removed several passengers from the plane, including Hicks, Moore, and Canty. Canty initially refused to deplane.

It is undisputed that, throughout the flight, none of the appellants committed assault or battery or verbally threatened any Continental flight crew member with physical harm. Rather, according to the testimony of the various members of the Continental flight crew, intimidation resulted solely from appellants' verbal and non-verbal expressive activity -- consisting primarily of appellants' repeated angry and profane remarks, although also including menacing stares, the refusal by Hicks and Moore to relinquish the boombox, and the intentional increase in the boombox's volume by Hicks and Moore. Bott also cited Hicks and Moore's repeated passing of the boombox between themselves after being asked to relinquish it. The Government argues that such intimidating expression, which occupied the attention of numerous members of the flight crew for a significant amount of time and ultimately caused the plane to be

diverted to Cancun, is the gravamen of appellants' § 1472(j) violation.

On September 4, 1991, a jury found Hicks, Moore, and Canty guilty of violating 49 U.S.C. § 1472(j).[2]  Sentencing occurred in the following November.  Hicks was sentenced to fourteen months imprisonment to be followed by three years of supervised release. Moore was sentenced to eight months imprisonment to be followed by three years of supervised release.  Canty was sentenced to four months imprisonment to be followed by three years of supervised release.  All three appellants were also each ordered to pay restitution in the amount of $1,871.35 to Continental Airlines, as well as a special assessment of $50.00.

## II.

### A. The first amendment challenge

Appellants Hicks and Moore[3] claim that their convictions under 49 U.S.C. § 1472(j) are in violation of the free speech

---

[2] That provision reads, in pertinent part, as follows:

(j) Whoever, while aboard an aircraft within the special aircraft jurisdiction of the United States, assaults, intimidates, or threatens any flight crew member or flight attendant (including any steward or stewardess of such aircraft), so as to interfere with the performance by such member of his duties, shall be fined not more than $10,000 or imprisoned not more than twenty years, or both. * * *

For convenience's sake, we shall refer to cockpit crew members, the flight service manager, and all flight attendants as "flight crew members."

[3] Appellant Canty raised one issue on appeal: whether the district court erred by failing to instruct the jury that a violation of § 1472(j) was a specific intent crime.  See infra Part II.D.

9

clause of the first amendment to the United States Constitution. Appellants specifically claim that the statute's operative term "intimidate" is overbroad

> because a person using profanity, which is not specifically [proscribed by] the statute, [but] which is constitutionally protected, could be accused of violating the statute. . . . That is, the [statutes's use of the] word "intimidate" cannot be limited to core criminal conduct but becomes an enforceable ordinance generally prohibiting [profane] speech, which is constitutionally protected. . . . By including . . . the term "intimidate" the statute fails to properly exclude [profane] speech which [is] protected by the First Amendment but which may also cause intimidation.

Although this passage from Hicks and Moore's briefs appears to be challenging the statute solely on overbreadth grounds, in reply briefs appellants respond that their "overbreadth challenge is both to the face of the statute, and as applied to the facts in this case" (emphasis added).

The Government argues that not only is § 1472(j) not overbroad, but also that "profanity [such as that spoken by appellants] used . . . to intimidate is proscribable speech. . . . It is similar to fighting words and obscenity." The Government proceeds to note, though, that § 1472(j) "proscribes intimidation of crew members that interferes with their duties, not profanity. It is not a content regulation of speech. . . [T]o the extent that it proscribes profanity used to intimidate crew members aboard an aircraft in flight, that proscription is permissible," as merely an "incidental" restriction on speech. At oral argument, however, the Government repeated its argument that profanity in general is not protected speech and, for that

10

reason, appellants have no basis for challenging the statute on first amendment grounds.

We agree with the Government that § 1472(j) does not violate the first amendment, although we do not rely on the totality of the Government's reasoning to reach this result. In addressing this claim, we are required to address both parts of appellants' two-pronged challenge -- that the statute is both overbroad and in violation of the first amendment <u>as applied</u> to the facts of the instant case.

### i) The overbreadth challenge

Appellants have made a spirited attempt to invalidate § 1472(j) on overbreadth grounds; however, as is evident from the above-quoted passage from their briefs, they have misconceived the overbreadth doctrine, at least as it applies to the instant case. Appellants argue that the term "intimidate" is overbroad in that it effectively criminalizes a form of speech -- simple profanity or vulgarity -- that may well intimidate, but should nevertheless be afforded protection under the first amendment.[4] While such an argument at first blush appears to be an overbreadth challenge, appellants are in fact only making a substantive challenge to § 1472(j) as it applies to intimidating

---

[4] We agree with appellants that the profanity generally is protected by the first amendment. However, the statute that appellants are challenging does not criminalize profanity <u>per se</u>, but instead criminalizes any speech or conduct, which may incidentally include profanity, that intimidates an airline's flight crew so as to interfere with the performance of their duties. <u>See</u> <u>infra</u> Part II.A.ii.

11

profanity or vulgarity such as that used by appellants. Appellants have not argued that "intimidate" is overbroad in that it may also chill _other_ types of protected expression besides profanity.

Appellants fail to realize that the rationale of the overbreadth doctrine is to protect the expressive rights of _third parties_ who are not before the court. An overbreadth challenge is not appropriate if the first amendment rights asserted by a party attacking a statute are essentially coterminous with the expressive rights of third parties. See Brockett v. Spokane Arcades, Inc., 472 U.S. 491, 504 (1985) (Courts need not entertain an overbreadth challenge "where the parties challenging the statute are those who desire to engage in protected speech that the overbroad statute purports to punish . . . . There is then no want of a proper party to challenge the statute, no concern that the attack on the statute will be unduly delayed or protected speech discouraged."); Members of the City Council of the City of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 801-02 (1984) ("[Appellees] have . . . failed to identify any significant difference between their claim that the ordinance is invalid on overbreadth grounds and their claim that it is unconstitutional when applied to their political signs."); International Society for Krishna Consciousness of New Orleans, Inc. v. City of Baton Rouge, 876 F.2d 494, 499-500 (5th Cir. 1989) (citing Vincent); L. Tribe, Constitutional Law, § 12-27, at 1022-24 & n.7.

12

Even if appellants had argued that § 1472(j) is overbroad because it chills expression other than profanity or vulgarity,[5] we do not believe that such an overbreadth challenge would be viable. The only type of protected speech[6] besides profanity that would have the potential to intimidate a reasonable person would be non-profane invective.[7] Even assuming, without deciding, that § 1472(j) could not constitutionally criminalize such angry non-profane invective, we observe that the statute's potential to criminalize such speech is too insubstantial to permit an overbreadth challenge. "It is clear . . . that the mere fact that one can conceive of some impermissible

---

[5] According to the Supreme Court in Vincent, a party challenging a statute as overbroad has the burden "to demonstrate a realistic danger that the ordinance will significantly compromise First Amendment protections of individuals not before the Court." 466 U.S. at 802; see also International Society for Krishna Consciousness, 876 F.2d at 500.

[6] We note that profanity should be distinguished from two somewhat related, but distinguishable, species of non-protected speech -- "fighting words" and obscenity. See Chaplinsky v. New Hampshire, 315 U.S. 568 (1942) (fighting words not protected); Miller v. California, 413 U.S. 15 (1973) (obscenity not protected). With reference to remarks made in the instant case, we believe that none rose to the level of "fighting words" or obscenity.

[7] For instance, we can hypothesize a scenario in which an intoxicated airline passenger becomes angry at a member of the flight crew because of the crew member's refusal to serve alcohol to the passenger. The passenger could hurl non-profane invective at the crew member, which -- depending on the tenor of the invective -- could intimidate the crew member so as to interfere with the performance of his duties. A similar hypothetical was actually mentioned by the sponsor of 49 U.S.C. § 1472(j) in the United States Senate. See remarks of Senator Engle, 107 Cong. Rec. 17170 (August 28, 1961) (hypothesizing scenario of "a drunk quarrelling with a stewardess over whether or not he could keep his bottle").

13

applications of a statute is not sufficient to render it susceptible to an overbreadth challenge."  Vincent, 466 U.S. at 800.  Rather, a party challenging a statute on overbreadth grounds must demonstrate that there is a "substantial" potential that the overbroad statute will chill third parties' speech.  See Broadrick v. Oklahoma, 413 U.S. 601, 615 (1973).[8]  We believe that § 1472(j) does not pose a "substantial" threat of overbreadth.

---

[8] Unlike the party who successfully challenged a somewhat similar statute invalidated on overbreadth grounds by this court and later by the Supreme Court in City of Houston v. Hill, 482 U.S. 451 (1987), aff'q, 789 F.2d 1103 (5th Cir. 1986) (en banc), appellants have not offered any proof that there is a realistic and substantial danger that § 1472(j) will be used to chill constitutionally protected speech.  In Hill, the plaintiff actually documented numerous prior instances where the challenged statute had been used to chill constitutionally protected speech. See 789 F.2d at 1113-14 (Appendix to majority opinion.) Appellants have offered no such data.
Our own research of reported cases has revealed that § 1472(j) has resulted in relatively few convictions.  Of those convictions discussed in reported decisions, the type of activity prosecuted invariably has not been protected by the first amendment.  See Annotation, Construction and Application of § 902(i-l) of Federal Aviation Act of 1958, as Amended (49 U.S.C. § 1472(i-l), Punishing Aircraft Piracy, Interference with Flight Crew Members, and Other Crimes Abroad Aircraft in Flight, 10 A.L.R. Fed. 844 (& Supp.) (discussing cases); Annotation, Validity, Construction, and Application of Provisions of Federal Aviation Act Punishing Air Piracy and Certain Acts Aboard Aircraft in Flight, or Boarding Aircraft, 109 A.L.R. Fed. 488, § 17B (discussing cases).  In every reported case in which a § 1472(j) conviction has occurred, the defendant has not simply engaged in "pure speech," whether profane language or non-profane invective, but has also directly threatened, assaulted, or battered a member of the flight crew.  See, e.g., United States v. Tabacca, 924 F.2d 906 (9th Cir. 1991); United States v. Hall, 691 F.2d 48 (1st Cir. 1982); United States v. Meeker, 527 F.2d 12 (9th Cir. 1975); Mims v. United States, 332 F.2d 944 (10th Cir. 1964).

14

## ii) The as-applied challenge

There is still a need to review appellants' first amendment challenge to § 1472(j) as applied to the facts of the instant case. As an initial matter, we must address the Government's threshold contention that profanity is not constitutionally protected speech. This argument is meritless. The Supreme Court has long held that, as a general rule, simple profanity or vulgarity -- not rising to the level of "fighting words" or obscenity -- is constitutionally protected speech.[9] See, e.g., Lewis v. City of New Orleans, 415 U.S. 130 (1972); Gooding v. Wilson, 405 U.S. 518 (1972); Cohen v. California, 403 U.S. 15 (1971); see generally Tribe, supra, § 12-10, at 849-56.

Although we disagree with the Government's broad contention about the constitutional status of profanity, we do recognize that general rules do have their exceptions. As the Supreme Court has repeatedly held, first amendment protections are not absolute, even in cases involving "pure speech." See, e.g., Elrod v. Burns, 427 U.S. 347, 360 (1976) ("the proscription on encroachment of First Amendment protections is not an absolute").

---

[9] By "profanity" or "vulgarity," we refer to words that, while not obscene, nevertheless are considered generally offensive by contemporary community standards. Cf. FCC v. Pacifica Foundation, 438 U.S. at 741 (discussing humorist George Carlin's "Filthy Words" monologue as qualifying as "indecent" or "profane" language). We note that such words usually refer to "offensive sexual or excretory speech." Id. at 743. We also believe that certain other language, at least when used in certain contexts, qualifies as profanity. For instance, with reference to the instant case, we believe that Appellant Canty's angry reference to Ms. Bott as a "bitch" and Appellant Moore's angry admonition that Ms. Bott should get her "ass" to the plane's kitchen qualified as profane.

In the instant case, we believe appellants' use of angry profanity and vulgarities may be constitutionally criminalized.

We note at the outset of our first amendment analysis that the Supreme Court has traditionally bifurcated its review of statutes challenged on first amendment grounds between cases involving a content-based regulation of speech and cases involving a content-neutral "time, place, or manner" restriction. See generally Tribe, supra, § 12-2, at 789-794. The Court has applied significantly greater scrutiny to content-based regulation, requiring a "compelling" governmental interest to justify the curtailment of speech based on its content and also requiring that the statute be "`narrowly drawn to achieve that end.'" Simon & Schuster, Inc. v. Members of New York Crime Victims Bd., 112 S. Ct. 501, 509 (1992). Conversely, the Supreme Court has been somewhat more deferential to legislative efforts to regulate time, place, and manner of expression -- requiring only a "substantial" governmental interest and "narrow tailoring," so long as such regulations are content-neutral. See Ward v. Rock Against Racism, 491 U.S. 781, 791-92, 796 (1989) ("reasonable" regulations on time, place, or manner "only if they are 'justified without reference to the content of the speech'" and if they are "`narrowly tailored to serve a substantial governmental interest'") (citations omitted).

Rather than discriminating against protected profanity or vulgarity, the statute reasonably regulates the time, place, and manner of speech, irrespective of its particular content. The

16

content of passengers' speech is thus regulated only in an incidental fashion.  Only intimidating speech in a quite limited context is proscribed.  See CISPES v. Federal Bureau of Investigation, 770 F.2d 468 (5th Cir. 1985).[10]  In other contexts, profanity -- even if intimidating -- would not go unprotected.  See, e.g., Nash v. State of Texas, 632 F. Supp. 951, 972-76 (E.D. Tex. 1986) (intimidating language in context of labor strikes is protected by first amendment).

Nevertheless, even if we were to accept appellants' argument that § 1472(j) does discriminate against profane or vulgar language, and thus apply the more stringent analysis required in cases involving a content-based regulation, we would still hold that the statute is constitutional.  Assuring the utmost in airline safety is the clear purpose behind § 1472(j).  See United States v. Meeker, 527 F.2d 12, 14 (9th cir. 1975) ("[T]he goal which Congress sought in this provision . . . was to deter [acts] which, if committed on the terrain below, might be

_____

[10] In CISPES, this court was faced with a first amendment challenge to a federal statute that criminalized, inter alia, the act of "willfully . . . intimidat[ing] . . . a foreign official in the performance of his duties."  Id. at 471 n.2.  We held that the statute was not content-based:

   [T]he statute here does not permit the government to
   discriminate on the basis of the content of expression.
   To the extent that it applies at all to protected
   conduct, it is not a restriction on any particular
   message.  It merely proscribes actions of a threatening
   or intimidating nature directed at any protected
   official, and First Amendment rights are affected only
   to the extent that their exercise might serve to create
   such intimidation . . . ."

Id. at 474.

17

considered relatively minor, but when perpetrated on an aircraft in flight would endanger the lives of many.")  In view of the special context of air travel -- pressurized vessels routinely carrying hundreds of passengers and traveling at speeds of up to 600 miles per hour and 40,000 feet above the ground -- we cannot gainsay that there is a compelling governmental interest for § 1472(j).  Congress did not unnecessarily infringe passenger's first amendment liberties to use intimidating profanity.  The potential for disaster being so great, even the more mundane duties of flight attendants which implicate safety cannot be taken for granted.  Moreover, we note that in the instant case, it was not only flight attendants, but also a member of the cockpit crew whose duties were interfered with by appellants.

We also believe that the statute is narrowly tailored.  It does not cast a sweeping net at amorphous categories of speech. See, e.g., Gooding v. Wilson, 405 U.S. 518, 523 (1972) (invalidating statute that proscribed "opprobrious" or "abusive" language).  Rather, the statute requires a passenger to "assault[], intimate[], or threaten[] . . . so as to interfere" with a crew member's duties.  49 U.S.C. § 1472(j).  "Intimidate," the operative term in the instant case, is a word that is not simply associated with a type of speech, but includes conduct as well.[11]  In fact, it encompasses only a relatively narrow range

_____

[11] We note that at least Appellants Hicks and Moore engaged not merely in intimidating speech, but also intimidating conduct. The parties, however, had limited their arguments to the speech elements of appellants' intimidation.

18

of speech, which frequently will be a concomitant of intimidating conduct, as in the instant case. Moreover, only intimidating acts or words that actually interfere with a crew member's duties are penalized. Usually only extreme or repeated intimidation -- such as that in the instant case -- will actually have the effect of interfering with a crew member's duties.

We hold that § 1472(j) is constitutional as applied to appellants in the instant case.

**B. Vagueness**

Appellants have raised a related challenge to the statute as being unconstitutionally vague. This argument is also without merit. We observe that the instant case is not an appropriate one in which to raise a void-for-vagueness challenge. "In a facial challenge to the . . . vagueness of a law[], a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct." Village of Hoffman Estates v. Flipside, 455 U.S. 489, 494-95 (1982). If the statute does not proscribe a "substantial" amount of constitutionally protected conduct, a party may raise a void-for-vagueness challenge only if "the enactment is impermissibly vague in all of its applications." Id. at 495 (emphasis added). As we discussed in connection with appellants' overbreadth challenge, the statute does not reach a "substantial" amount of constitutionally protected conduct. Thus, because § 1472(j) obviously is not impermissibly vague in all its applications,

19

appellants' void-for-vagueness challenge must fail.  Furthermore, we note that "[o]ne to whose conduct a statute clearly applies may not successfully challenge it for vagueness."  Id. at 495 n.7.  There is no question that appellants' conduct violated § 1472(j).  Nevertheless, we note that the Ninth Circuit, in a void-for-vagueness challenge in which the court actually reached the merits, has upheld § 1472(j).  See United States v. Tabacca, 924 F.2d 906, 913 (9th Cir. 1991).

## C. The definition of "intimidation" in the jury charge

The district court's jury instruction with regard to the term "intimidate," as used in § 1472(j), was as follows:

> In considering whether the actions of the Defendant(s) amounted to intimidation, you are instructed that it is sufficient if the words and conduct of the Defendant(s) would place an ordinary, reasonable person in fear.

Appellants objected to this charge and requested what they claimed was a more appropriate "dictionary" definition of "intimidate" -- "to compel or deter by or as if by threats" -- which the district court denied.[12]

Rejection of appellants' argument here requires little discussion.  "In reviewing a challenge to a jury charge, we must determine whether a court's charge, as a whole, was a correct statement of the law.  When the complaint is that the trial court

---

[12] This definition is listed in Websters New Collegiate Dictionary (1979), at p. 600, as a part of a larger definition: "[T]o make timid or fearful; Frightful; esp: to compel or deter by or as if by threats."

refused to give a requested instruction, this court must determine whether this refusal was an abuse of discretion." United States v. Sellers, 926 F.2d 410, 414 (5th Cir. 1991). Our research indicates that the most commonly understood "dictionary" definition of "intimidate" is in fact the one given by the court -- namely, to place a person in fear. Interestingly, this was the primary definition listed in Webster's New Collegiate Dictionary, the dictionary cited by appellants at trial; appellants requested a more specific, secondary definition. While intimidation may result from words or conduct that may directly threaten, it is commonly understood that a person may intimidate another without actually making a direct or even veiled threat. Indeed, § 1472(j) uses the terms "threaten" and "intimidate" in the disjunctive.

We also observe that the district court not only instructed the jury correctly on the definition of "intimidate," but actually charged the jury in a way that was considerably more favorable to appellants than the instruction requested by appellants. Appellants' proposed instruction encompassed subjective intimidation -- i.e., intimidation that results from another's words or acts, whether or not the intimidated party's perception is reasonable. Conversely, the district court instructed jurors that they could find that intimidation occurred only if a reasonable person would have been intimidated by

21

appellants' words and conduct.[13]  The district court did not
abuse its discretion.

## D. General or specific intent?

Appellants[14] contend that a violation of § 1472(j) requires
a specific, as opposed to general, intent.  Appellants argue that
the district court erred by giving only a partial specific intent
instruction.[15]  We observe that the court's charge essentially
tracked the language of the statute, with the exception of
requiring that the jurors find that appellants "knowingly"
intimidated the crew members.  The appellants argue that the
district court nevertheless should have gone further and charged
the jury that it could convict only if it also found that

---

[13] The district court apparently adopted the objective
definition of "intimidate" from that given by the district court
in United States v. Meeker, 527 F.2d 12, 15 (9th Cir. 1975), a
case involving a § 1472(j) violation.

[14] This was the only claim raised by Appellant Canty on
appeal.

[15] The district court's charge regarding the mens rea
necessary for a conviction read as follows:

> For you to find the defendant[s] guilty of this crime,
> you should be convinced that the United States has
> proved each of the following beyond a reasonable doubt:
>
> * * *
>
> (2) the defendant(s) knowingly and unlawfully intimidated
> any flight crew member of flight attendant (including
> any steward or stewardess),
>
> (3) So as to interfere with the crew member(s) or flight
> attendant(s) performance of their duties, or to lessen the
> ability of the crew member(s) or flight attendant(s) to
> perform their duties . . . .

22

appellants knowingly intimidated <u>with the specific intent to interfere with a crew member's duties</u>.  As the charge read, it only required a specific intent to intimidate, not a specific intent to interfere.

The only other court to directly address this issue is the Ninth Circuit.  In <u>United States v. Meeker</u>, 527 F.2d 12, 14 (9th Cir. 1975), the court held that § 1472(j) is a general intent crime. <u>See</u> <u>also</u> <u>United States v. Brice</u>, 926 F.2d 925, 929 (9th Cir. 1991); <u>cf.</u> <u>United States v. Busic</u>, 592 F.2d 13, 21 (2d Cir. 1978) (49 U.S.C. § 1472(i), a related statutory provision criminalizing air piracy, held to be general intent crime).  We agree that § 1472(j) is a general intent crime.  The paramount purpose of the statute, as we discussed <u>supra</u>, is to ensure that passengers do not impede airline crew members' duties, many of which are critical to the safe operation of the aircraft.  As the <u>Meeker</u> court explained, "we . . . construe § 1472(j) as a general intent crime, in harmony with the [compelling] statutory purpose of safeguarding flight personnel from any statutorily described acts which would interfere" with their duties.  527 F.2d at 14.

Whether a passenger specifically intends to interfere with those duties is irrelevant.  General intent is all that Congress required, as is evident from the plain language of the statute -- in particular, Congress' failure to use a term such as "willfully," "intentionally," or "knowingly," and Congress' selection of the phrase "<u>so as to</u> interfere."  <u>See</u> <u>United States v. Lewis</u>, 780 F.2d 1140, 1143 (4th Cir. 1986) (courts should

23

presume statutes require only general intent "[i]n the absence of an explicit statement that a crime requires specific intent").[16]

Appellant Canty additionally argues that the court erred in giving the jury an aiding-and-abetting instruction that required specific intent, if the statute itself only requires general intent. This created an impermissible anomaly, Canty argues. We observe that Canty did not object to this aspect of the jury charge. Thus, we can only review this claim for plain error. Fed. R. Crim. P. 52(b). We find no such error. Indeed, if anything, such an instruction was salutary error, which likely benefitted Canty, as it may have led jurors to believe that they could convict Canty only if they found that he possessed a specific intent to violate § 1472(j).

## E. Sufficiency of the evidence

Appellants challenge the sufficiency of the evidence supporting their convictions. We begin by noting the familiar standard of review of sufficiency claims, which was articulated by the Supreme Court in Jackson v. Virginia, 443 U.S. 307, 319 (1979) -- whether, based on the totality of evidence at trial,

---

[16] Appellant Canty at one point in his brief argues that § 1472 is a strict liability crime, which is disfavored in our law except for minor offenses. See Morissette v. United States, 342 U.S. 246 (1952). We disagree that § 1472(j) imposes strict liability. The statute requires intent for the intimidation element of the statute; the statute merely requires no mens rea for the result of the intimidation, i.e., causing interference with crew members' duties. The gravamen of the offense -- for which intent is required -- is intimidation, not interference. Interference with the flight crew is merely an attendant circumstance.

24

and all reasonable inferences therefrom, and in a light most favorable to the Government, a rational juror could find all elements of an offense beyond a reasonable doubt.

**i) Whether there was sufficient evidence of "intimidation"?**

Appellants Hicks and Moore argue that mere words -- at least words that do not constitute a direct threat -- cannot constitute intimidation.  We disagree.  As we noted in our discussion of the district court's definition of "intimidate," that term is not synonymous with "threaten."  With respect to the evidence presented by the Government at trial, we observe that numerous members of the Continental flight crew testified that appellants intimidated them.  In the environment in which appellants' statements[17] were made -- the closed quarters of an airplane -- the extreme and repeated profanity which they used, when combined with the angry tenor of their words, certainly would intimidate a reasonable person.  Appellants' words were not merely indicative of aimless frustration; rather, they evinced extreme anger vis-a-vis particular persons, namely Continental flight crew members. The intimidation was thus likely even greater in Hicks' case.

Finally, we observe that it was not merely words, but also appellants' conduct, that intimidated the flight crew members. We note that Hicks and Moore's repeated refusals to relinquish

---

[17] As we set forth in the statement of the facts in supra Part I, Appellants Hicks and Moore each engaged in extreme and repeated angry profanity and vulgarity.  Appellant Canty has not challenged the sufficiency of the evidence supporting his conviction.

25

the boombox after being requested to do so, in combination with their angry declarations that the "f---ing radio [is] going to stay on," certainly would have intimidated a reasonable person. We also observe that the very real threat that appellants would play the radio component of the boombox, which could have caused critical navigational equipment to malfunction, no doubt was intimidating.

**ii) Whether there was sufficient evidence of "interference"?**

There is ample evidence in the record to support a rational fact-finder's conclusion that appellants interfered with numerous Continental flight crew members' duties. There was specific testimony to this extent from Melissa Bott and Carol McWilliams. There was also other evidence indicating that flight crew members, including a member of the cockpit crew, were forced to ignore their duties as a result of the appellants' intimidating words and conduct.

We conclude that there was sufficient evidence to support appellants' convictions under § 1472(j).

**III.**

For the foregoing reasons, we AFFIRM all three appellants' convictions under 49 U.S.C. § 1472(j).