**UNITED STATES of America**

v.

**Alonzo SPELLMAN**

**No.  CRIM.02–494.**

United States District Court,
E.D. Pennsylvania.

Feb. 4, 2003.

Nancy Beam Winter, AUSA, United States Attorney's Office, Philadelphia, PA, for the Government.

Judith S. Gracey, Lathrup Village, MI, for defendant.

## MEMORANDUM

DALZELL, District Judge.

On January 7, 2003, defendant Alonzo Spellman pleaded guilty to interference with flight attendants and crew members, in violation of 49 U.S.C. § 46504, and to two counts of simple assault on an aircraft, in violation of 49 U.S.C. § 46506, all arising from what can only be described as every air passenger's and crew member's nightmare on Delta Flight 2038 on July 23, 2002. At Spellman's sentencing yesterday, we were presented with the unusual coincidence of (a) the Government's motion for upward departure and (b) the defendant's motion for downward departure.

Thus, for different reasons, both the Government and the defendant agree that Spellman's case is outside of the Sentencing Guidelines "heartland", and our task yesterday was to determine whether either of them was right. This Memorandum amplifies the findings of fact and conclusions of law we made on the record at the close of the protracted hearing yesterday.

### Factual Findings

It is undisputed that Alonzo Spellman is a veteran of the National Football League. After graduating from Ohio State University, where he was first-team AP All–Big Ten, Spellman starting in 1993 played with the Chicago Bears, where as a defensive end in 1995 he set a club record for sacks in consecutive games.[1] He later signed with the Dallas Cowboys, and then played for the Detroit Lions until his release for tardiness at practices.

As one might expect from his impressive career in football defense, Spellman is something of a man-mountain. Not only is he six feet, six inches tall, but he now weighs 330 pounds, and can be so formidable-looking that (as will be seen) Philadelphia police officers were afraid to arrest him.

At the sentencing hearing, we heard the testimony of seven passengers and crew members who on July 23, 2002 shared the misfortune of flying on Delta Flight 2038

---

1. Seven, to be exact. *See* Spellman's biography at www.nfl.com/players/4309_bios.html.

from Cincinnati, Ohio to Philadelphia, Pennsylvania.[2] Shortly after sitting in Row 21 of the aircraft, Spellman began speaking loudly about a variety of subjects, including the plane crashing. He made remarks such as, "I hope we make it to Philadelphia before this plane crashes into a building." After the aircraft was airborne for about twenty minutes, Spellman added obscenities to his verbal barrage, including in a loud voice, "motherfucker", "fuck you", "shit", and "bitch."

When flight attendant Danielle Eller spoke to Spellman, he asked her if she was a Christian. Upon quietly answering in the affirmative, Spellman commanded her to say out loud that she was a Christian. Ms. Eller tried to ignore this behavior, and shortly thereafter she saw Spellman swinging his arms in the air and saying in a loud voice, "I'll smash your fucking head with my cleats, I will".

Flight attendants told Spellman that this kind of behavior was unacceptable, especially with families on the plane, and told him he was scaring many of the other over 130 passengers. Spellman ignored these requests. Ms. Eller reported that all of the passengers around Spellman remained frozen in their seats, frightened even to get up and go to the bathroom for fear of attracting Spellman's attention.

About a half hour into the flight, Karen Weaver, who sat in the seat in front of Spellman and who was travelling with her two small sons, turned around and requested that Spellman not use such vulgar language, explaining that she was travelling with small children. Spellman's response to Mrs. Weaver's polite request was, "Oh, you're going to tell me to mind my tongue, you Jew."

Although Mrs. Weaver tried to ignore Spellman, his verbal barrage continued with, "You hear me, Mom, now you're not going to talk to me." Commenting on Mrs. Weaver's skirt, he said, "Where do you get off wearing your miniskirt and showing your pussy to everyone?" He added that she "could show her body to everybody dressed like a whore in front of [her] kids". Spellman referred to Mrs. Weaver's two- and three-year-old sons as "sorry white boys."

Mrs. Weaver remained quiet, but began crying. Her husband, Stephen, who was seated in a different row, tried to intervene. Spellman kept up his verbal assaults on Mrs. Weaver and taunted her husband, saying, "What are you going to do about it, Dad?"

Flight attendant Lane Stephens tried to accomplish what flight attendant Eller had failed to achieve, but Spellman immediately challenged her with loud and insulting comments about her appearance. When Ms. Stephens told Spellman that he couldn't use such language, and that police would meet the plane, Spellman responded that he didn't care and predicted that the police wouldn't do anything to him.

As Ms. Stephens was taking down the names of people in seats around Spellman as witnesses to give to the police, Spellman said to her, "You got a problem with me, you want me to take you down?" Since Spellman showed no signs of calming down, the flight attendants thrice advised the pilot, Captain Robert Freund, of what was happening. Captain Freund ultimately made an announcement requesting that the passenger stop his conduct and stating that it would result in his arrest. In response, Spellman yelled that he would "get

2. In addition to the Presentence Investigation Report, we have the benefit of Spellman's admissions at his change of plea hearing. We also refer, for certain details, to the victim statements that have been submitted and whose reliability is not questioned. *United States v. Queensborough*, 227 F.3d 149, 161 (3d Cir.2000). Together, our findings all are based on, at a minimum, clear and convincing evidence.

off" because he was "bipolar". Spellman's conduct worsened after the Captain's admonition.

Passenger Arthur Daemmrich had the bad luck to sit next to Spellman. Mr. Daemmrich was so frightened that he spent much of the flight in the galley area without a seat (all other seats on the aircraft being occupied). Because he was so afraid, and notwithstanding FAA regulations requiring all passengers to be seated and restrained by a seatbelt, flight attendant Anne Chase granted permission to Mr. Daemmrich to sit in the bathroom stall during the landing.

Perhaps most dramatic of all, several passengers reported that Spellman, according to the account of passenger John Liebenthal, "talked out loud about opening the door while in flight." Passenger Matthew Lynch, who testified that he takes about one hundred Delta flights per year, reported that he had "never experienced anything close to this," i.e., statements about opening the door during flight. Passenger Carol McAdam recalled Spellman's words as, "Give me a parachute and I'll jump off this plane", and said that she believed, "This could be another incident similar to the hijackings that occurred on September 11." Passenger Sally Schulz reported that she "was particularly scared when Spellman said that he wanted to open the door so he could get out." [3]

As a direct result of Spellman's conduct, Captain Freund contacted air traffic control at Philadelphia International Airport to request a "priority handling". The tower granted the Captain's request, and other planes that were ahead of Delta Flight 2038 were ordered to clear the way. Cap-

tain Freund testified that he had only "broken out" of an orderly landing pattern four times in his twenty-two years as a commercial airline pilot. He explained that this "hazardous procedure" created danger for the two aircraft ahead of Flight 2038 because in three to four seconds the planes automatically go at full power from a ten degree descending pitch to a thirty degree ascent, which is "very disconcerting for passengers—they scream out." Because his aircraft was landing before he and his crew could complete their normal protocol, Captain Freund also reported that there was "no tolerance for error" in his landing. Flight 2038 then landed ahead of the other planes.

Captain Freund directed all the passengers to remain seated until such time as Spellman was removed from the aircraft. But because of Mr. Weaver's fear for his children, as soon as the plane was on the ground, he "scooped up" his sons in each arm and ran up the narrow aisle to the galley while the aircraft taxied to the gate, a very dangerous act. Karen Weaver followed close behind.

Once the plane was near the gate, Captain Freund entered the passenger compartment to escort Spellman out of the plane. While the aft aircraft door was still closed and locked, Captain Freund approached Spellman and observed that it was "obvious" that the passengers around him "were terrified." On the Captain's approach, Spellman raised his hands to him and said, "You see this, I can feel the adrenaline rushing through my hands, I'm about to rip your throat out." Notwithstanding this ghastly and highly credible threat,[4] Captain Freund continued to at-

---

3. Indeed, Spellman's psychiatrist recorded a telling admission about Spellman's threat to open the aircraft's door:
    Wanted to open door? [Spellman is asked] "Ah, No! Just mad, getting under their skin for telling me to shut up."

Gov't.'s Mem. at 13.

4. Captain Freund confessed that "I was shaking in my shoes. I was very, very scared."

tempt to keep Spellman calm, but Spellman said that if the police came aboard, "they are going to carry me off in a body bag." The Captain testified that "I was certain people were going to be hurt."

At this point matters reached a level bordering on the surreal. When the Captain and Spellman finally got to the front of the plane, the aircraft door was not fully open. Captain Freund asked why the ground crew had not opened the door and was informed that the Philadelphia police had told the ground personnel *not* to open the door until more police arrived. Not wanting to keep over 130 people hostage to this evident danger, the Captain commanded the crew to open the aircraft door.

When Spellman and his mother and sister left the aircraft, the armed Philadelphia police—perhaps as many as six of them—did nothing. At all times Spellman continued to act aggressively, cursing all the while and frightening everyone in his path. The passengers reported that when they complained to the Philadelphia police about their inaction, the officers, displaying indifference and abject cowardice, responded to them, "You want to help?"

After menacing about in the baggage area for upwards of forty-five minutes with the Philadelphia police at all times giving him a wide berth, Spellman eventually left the airport, unimpeded by local law enforcement.[5]

*Legal Analysis*

As noted at the outset, both sides have moved for departures from the four to ten month range called for under the parties'

agreement.[6] By stipulating to a base offense level of 9 under U.S.S.G. § 2A5.2(a)(4), the parties inferentially negate two earlier subsections of this Guideline. For completeness, therefore, we quote § 2A5.2 in full:

### Interference with Flight Crew Member or Flight Attendant

(a) Base Offense Level (Apply the greatest):

> (1) **30**, if the offense involved intentionally endangering the safety of the aircraft and passengers; or
>
> (2) **18**, if the offense involved recklessly endangering the safety of the aircraft and passengers; or
>
> (3) if an assault occurred, the offense level from the most analogous assault guideline, §§ 2A2.1–2A2.4; or
>
> (4) **9**.[7]

From the full text, it is apparent that, most relevant to Spellman's case, the parties have in their agreement excluded "recklessly endangering the safety of the aircraft and passengers" and "intentionally endangering the safety of the aircraft and passengers". While this agreement introduces certain problems mentioned below in note 19, we will assume for purposes of disposing of the pending motions that the proper base offense level is indeed **9**.

A. *Downward departure for diminished capacity*

Spellman asserts that we should depart downward based upon U.S.S.G. § 5K2.13, which provides, in relevant part,

---

**5.** Against the craven indifference of the Philadelphia police, Captain Freund and the rest of the crew were "exemplary," to take the praise of the highly experienced passenger, Matthew Lynch. Considering that Captain Freund is less than half Spellman's weight and eight inches shorter, he is also a brave man indeed and a credit to his profession.

**6.** *See* Presentence Investigation Report ¶¶ 5i; the calculations consequent to this stipulation appear at PSI 28–54 and 77, which we adopted over the defendant's objection.

**7.** U.S.S.G. § 2A5.2 (Nov. 1, 2001 ed.). Throughout this memorandum, we quote from the 2001 edition that was in effect during Spellman's ill-starred flight.

A sentence below the applicable guideline range may be warranted if the defendant committed the offense while suffering from a significantly reduced mental capacity. However, the court may not depart below the applicable guideline range if ... (2) the facts and circumstances of the defendant's offense indicate a need to protect the public because the offense involved actual violence or a serious threat of violence ....

Based on Spellman's and the Government's experts' reports, as well as on the testimony of Dr. Xavier Amador, we conclude that Spellman was suffering from a bipolar disorder at the time of the offense. Although Doctors Sadoff and Amador part company as to whether Spellman's mental capacity was "significantly diminished," even if we were to side with Dr. Amador we still would have to face the more difficult question of whether we are precluded from granting the departure because Spellman's conduct involved "a serious threat of violence."

At first blush, it appears self-evident that Spellman's offense involved serious threats of violence. Spellman told a flight attendant that he would "take her down." He threatened to open the plane door midflight. And after the plane landed in Philadelphia, he told Captain Freund, "I can feel the adrenaline rushing through my hands, I'm about to rip your throat out." Spellman contends, however, that there was no serious threat of violence because he was unarmed, he never actually touched anyone, and his words were an unfortunate product of his mental condition.

Spellman's argument merits careful examination because the meaning of the term "serious threat of violence" is uncertain in this Circuit. In *United States v. Askari*, 159 F.3d 774 (3d Cir.1998) ("*Askari III*"), our Court of Appeals considered whether a mentally ill bank robber who was unarmed and did not make specific verbal threats of harm qualified for a downward departure under a now-superseded version of § 5K2.13.[8] In an *en banc volte-face*, the Court vacated a prior decision (itself the product of a "deeply divided" *en banc* Court) that upheld the district court's denial of a downward departure under the old version of the guideline. *Id.* at 777–80, *vacating United States v. Askari*, 140 F.3d 536 (3d Cir.1998) ("*Askari II*") ("*Askari I*" was a 1997 unpublished decision). Confessing that whether Askari's offense involved a "serious threat of violence" under the amended version of § 5K2.13 "most likely still divides the court," the Court in *Askari III* remanded the case to the district court to rule on the meaning of this term. *Id.* at 780.

In arguing that his conduct did not involve a serious threat of violence, Spellman principally relies on *United States v. McFadzean*, 1999 WL 1144909 (N.D.Ill. Dec.8, 1999). In *McFadzean*, a mentally ill bank robber handed notes to tellers demanding money and stating that he had a gun. In fact, he was unarmed and was not wearing a disguise. The judge concluded that McFadzean's conduct did not preclude a downward departure, reasoning that he did not actually pose a serious threat to anyone because he was unarmed

---

**8.** Under the then-applicable version of § 5K2.13, the downward departure was only available to a defendant who committed a "nonviolent offense." The amended version of § 5K2.13, which the United States Sentencing Commission adopted on April 7, 1998 (one day before the Court of Appeals's decision in *Askari II*), introduced the language that governs Spellman's sentencing: "The court may not depart below the applicable guideline range if ... the facts and circumstances of the defendant's offense indicate a need to protect the public because the offense involved actual violence or a serious threat of violence ...."

and had no means to harm anyone. In the court's words, "McFadzean's threat was ... an empty one." *Id.* at *5. *But see id.* at *6 (denying downward departure under § 5K2.13 on the grounds that McFadzean's criminal history suggested the need to protect the public).

*McFadzean* highlights an ambiguity in the phrase "serious threat of violence": should the judge determine whether the defendant's conduct posed or created a threat of violence from the perspective of an impartial spectator?[9] Or is it enough that the defendant actually made a threat?

We need not resolve this ambiguity because Spellman both engaged in conduct that created a serious threat of violence and made serious threats. Even though the witnesses have confirmed that Spellman never got up from his seat or touched another person, his menacing conduct unquestionably posed a serious threat of violence. Spellman's threats and abusive conduct so alarmed other passengers that several actively considered attacking him if he so much as got up from his seat.[10] We can only shudder to think what would have happened if these passengers had to act on those plans.

As we have already noted, Spellman also made serious threats. Spellman responds to this uncontested reality by arguing that his statements were not truly serious because if he had "wanted to harm someone, he would have done more than make verbal statements." Def.'s Mem. at 9. In other words, he contends that he is not precluded from seeking a downward departure under § 5K2.13 because his outbursts on the plane were not backed by a subjective intent actually to threaten anyone.

Spellman's argument highlights yet another latent ambiguity in the language of § 5K2.13. In applying this guideline, should the court focus on the defendant's subjective intent in making a statement or is it sufficient that others perceived the statement as threatening?

As interesting as this question may be, the answer has no bearing on Spellman's case because the record clearly establishes that he subjectively intended his statements to be threatening *and* that his victims perceived his statements as such. Dr. Amador's handwritten notes, discussed during his testimony, reveal that when he asked Spellman about his threat to open the plane door, Spellman responded: "Ah, No! Just mad, getting under their skin for telling me to shut up." Gov't.'s Mem. at 13. His words to Captain Freund ("I feel the adrenalin rushing through my hands.") also demonstrated that Spellman well knew that his physical characteristics made his threats especially frightening.

■ For these reasons, we conclude that Spellman is ineligible for a downward departure for diminished capacity. He both made serious threats of violence and engaged in conduct that created a serious threat of violence. Taken as a whole, his conduct strongly shows the need to incarcerate him to protect the public.

### B. *Upward Departure*

The Government contends that two factors in this case remove it from the heart-

---

**9.** A journalist might invoke this meaning of the term "threat of violence" by writing, "The threat of violence hung in the air as protesters and riot police warily eyed each other."

**10.** Passenger Matthew Lynch went so far as to testify that he and fellow passengers had agreed to get up and try to stop Spellman if Spellman moved toward the door. *See also* Statement of Patricia Fanty, Govt. Mem. at 9 (Several male passengers "were watching him and planning to take him down if he got up."); Statement of John Liebenthal, *id.* at 10 (decided to hit Spellman with his laptop if Spellman moved toward the cockpit).

land of the applicable guideline, § 2A5.2 (Interference with Flight Crew Member or Flight Attendant), which governs sentencing in convictions under 49 U.S.C. § 46504. The Government first cites the passengers' extraordinary fear for their safety, and also notes the significant disruption of the flight and the risk of physical harm to passengers.[11]

The Government argues that the passengers' fear that Spellman would physically attack the targets of his abuse or, more chilling, bring down the plane by opening the door mid-flight, takes this case outside the heartland of § 2A5.2(a)(4).

At the threshold, we must determine whether § 2A5.2(a)(4) already takes into account passengers' fears. This task is complicated by the fact that we ourselves have never before sentenced a defendant under 49 U.S.C. § 46504. *See Iannone*, 184 F.3d at 227 (" 'Whether a given factor is present to a degree not adequately considered by the Commission ... [is a] matter[ ] determined in large part by comparison with the facts of other Guidelines cases' and ... district courts 'see many more Guidelines cases than appellate courts do.' ") (quoting *Koon*, 518 U.S. at 98, 116 S.Ct. 2035). The text of § 2A5.2

and the Commission's commentary are not particularly illuminating because they closely track Section 46504. We have therefore mapped the heartland of § 2A5.2 by examining the text and legislative history of Section 46504 as well as the facts of other reported cases involving convictions under Section 46504. Based on this analysis, we conclude that the form and degree of fear experienced by Spellman's fellow passengers remove this case from the heartland of § 2A5.2(a)(4).

To begin with, a straightforward reading of Section 46504's text suggests that Congress did not enact this statute in order to impose a criminal sanction on people who instill fear in flight passengers. Instead, the statute seeks to protect aircraft safety by punishing assaults against, and intimidation of, flight crew members:

> An individual on an aircraft ... who, by assaulting or intimidating a flight crew member or flight attendant of the aircraft, interferes with the performance of the duties of the member or attendant or lessens the ability of the member or attendant to perform those duties, shall be fined ... imprisoned ... or both.

The legislative history of Section 46504's predecessor, 49 U.S.C. § 1472(j), confirms

---

11. Our Court of Appeals has detailed the analysis that the sentencing judge should apply in considering an upward departure:

> (1) Identify the factor or factors that potentially take the case outside the Guidelines' "heartland" and make it special or unusual.
> (2) Determine whether the Guidelines forbid departures based on the factor, encourage departures based on the factor, or do not mention the factor at all.
> (3) Apply the appropriate rule:
> (1) If the factor is forbidden, the court cannot use it as a basis for departure;
> (2) If the factor is encouraged, the court is authorized to depart if the applicable guideline does not already take it into account;

> (3) If the factor is discouraged, or encouraged but already taken into account by the applicable guideline, the court should depart only if the factor is present to an exceptional degree, or in some other way makes the case different from the ordinary case in which the factor is present; or
> (4) If the factor is unmentioned, "the court must, after considering the structure and theory of both relevant individual guidelines and the Guidelines taken as a whole, decide whether the factor is sufficient to take the case out of the Guideline's heartland."

*United States v. Iannone*, 184 F.3d 214, 226–27 (3d Cir.1999), *quoting Koon v. United States*, 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996).

that passenger safety—and not passenger intimidation—is the focus of this statute.[12] The Report of the House Committee on Interstate and Foreign Commerce noted that aircraft safety required the enactment of federal statutes governing in-flight crimes:

> Laws which may apply [to in-flight crimes] are frequently inadequate to cover fully the magnitude of the crime, and, often, do not impose a penalty in keeping with the seriousness of the offense. That is true especially of certain offenses which, if committed on the ground, might be minor, but when committed in a high-speed aircraft in flight jeopardize the lives of a great many people.

H.R.Rep. No. 87–958 (1961), *reprinted in* 1961 U.S.C.C.A.N. 2563, 2565.

The Commerce Committee went on to find that a provision providing punishment for assaults against, and intimidation of, flight crew members was particularly necessary because "[o]n an aircraft in flight the ability of its personnel to function efficiently is vitally important to the operation of the aircraft and the safety of those on board the aircraft." *Id.* at 2670.

Our survey of published decisions confirms that the facts of this case take it outside the heartland of § 2A5.2(a)(4). In typical prosecutions under Sections 1472(j) and 46504, the defendants insult, physically harass, and in some cases even threaten to kill flight personnel.[13] However, it is the rare case in which passengers experience the degree of fear and intimidation that Spellman instilled in so many of his fellow passengers. Indeed, we found few cases [14] in which the passengers had serious grounds to worry that the offender would actually bring down the plane.[15]

As noted at the beginning of our legal analysis, the parties' stipulation presupposes their agreement that what Spellman did fell below recklessness, which would have triggered a base offense level of eighteen rather than of nine. Interestingly, most of the reported cases we have found that address sentencing issues under Sec-

---

**12.** Section 1472(j) was added to the Federal Aviation Act of 1958 after an in-flight assault, followed a few weeks later by a hijacking, drew national publicity in July, 1961. It was revised in 1994 to eliminate redundant language (*e.g.*, references to "stewards and stewardesses" in addition to "flight attendants"). *See* H.R.Rep. No. 103–180, at 390 (1993).

**13.** The Appendix lists cases we have considered in determining the Guideline's heartland.

**14.** The sole case we have found in which the defendant threatened to bring down the plane, and in which the most serious charge was for intimidating or threatening the flight crew, is *United States v. Hall*, 691 F.2d 48, 50 (1st Cir.1982), where the defendant attempted to set paper on fire and threatened to blow up the plane. We note that in most cases involving credible threats to bring down aircraft or attacks on cockpit crew, the defendant was charged with both air piracy and intimidating or threatening the flight crew. *See, e.g., United States v. Clark*, 274 F.3d 1325 (11th Cir.

2001) (defendant chartered and then hijacked a helicopter in a scheme to assist her husband and another man escape Florida's death row); *United States v. Calloway*, 116 F.3d 1129 (6th Cir.1997) (defendant seriously injured cockpit crew during assault with spear gun); *United States v. Patterson*, 20 F.3d 809 (10th Cir. 1994) (defendant commandeered flight school's plane during a lesson); *United States v. Mena*, 933 F.2d 19, 22 (1st Cir.1991) (while flicking a lighter, defendant threatened to blow up plane with "a tin can equipped with a wick and protruding brass contacts").

**15.** The Government has urged us to consider how passengers' fears have been heightened by the hijackings of September 11, 2001. While the Government may well have a point, we need not apply it here because Spellman's conduct, in particular his threat to open the plane door, would have instilled extraordinary fear even before the events of September 11th.

tion 46504 involve the question as to whether a particular defendant's conduct was "reckless" or something less.[16] But it is clear here that, looking at the constellation of events, the most analogous Guideline would indeed be recklessness under § 2A5.2(a)(2), notwithstanding the parties' stipulation that by implication negates recklessness.

To be sure, one can find recklessness cases where, for example, a passenger charges the cockpit or strikes a flight attendant. But we have found no case, even among recklessness decisions, where a defendant's conduct caused the pervasive terror that Spellman achieved in causing Captain Freund to request priority handling that endangered the McDonnell–Douglas 88 and two other aircraft on that July night.[17]

Even when Flight 2038 landed, Spellman's conduct continued to jeopardize passenger and crew safety, most notably Captain Freund, but also the Weaver family. It will also be recalled that when Captain Freund sought to open the door, the jetway was not yet there; had the nearby panicked passengers sought to leave the plane as soon as it came to the gate, they would have subjected themselves to the risk of a serious fall.

Further measure of the degree of the fear that Spellman engendered will be found in the craven response of the Philadelphia police. Had Spellman been like the drunks and other out-of-control passengers described in the reported decisions and in the four or five instances Captain Freund described to us, it is hard to believe that the police would have recoiled from action as they did here. It was, however, precisely because Spellman knew how to instill fear in people that he was able to subdue even armed police officers.

■ Thus, under the *Koon*-mandated analysis, we have determined that, although we are dealing here with unmentioned factors, the record in this case makes Spellman's case sufficiently special and unusual as to take it out of the Guidelines heartland.[18]

### C. Degree of Departure

■ While the analysis of these motions leads us to conclude that Spellman's case

---

**16.** *See, e.g., United States v. Poe,* 2000 WL 369506 (9th Cir.2000); *United States v. Vickaryous,* 1996 WL 2773 (10th Cir. Jan.4, 1996); *United States v. Jenny,* 7 F.3d 953 (10th Cir.1993); *United States v. Ignagni,* 1993 WL 366463 (9th Cir. Sept.21, 1993); *United States v. Guerrero,* 193 F.Supp.2d 607 (E.D.N.Y.2002).

**17.** And as we have already noted, *supra* n. 14, cases involving pervasive fear generally result in convictions for both air piracy and interference with the flight crew.

**18.** In her written submissions to us and in her cross-examination, Spellman's counsel seems to imply that the Government is treading upon the forbidden waters of U.S.S.G. § 5H1.4, which provides, in relevant part, that "[p]hysical condition or appearance, including physique, is not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." The implication is that by granting the Government's motion, we inevitably punish Spellman for his size and thus rely on this discouraged factor. It is evident from this record, however, that Spellman himself traded upon his imposing stature in a conscious, and wholly successful, effort at intimidating those around him, not unlike his undoubted intimidation skills on the line of a National Football League game.

Spellman's counsel also implies that there is an undercurrent of impermissible racism under § 5H1.10. We dispatch this untenable contention by quoting the testimony of Deborah Jenkins, an African–American fellow passenger, who said to us that what happened on Flight 2038 "was not about color, was not about race." Indeed, she herself could not even tell the race of the offending passenger when she heard his loud voice.

is outside the Guideline heartland, we stop short of departing all the way to an Offense Level 18 under § 2A5.2(a)(2) because of Spellman's undoubted and undisputed mental disability. To be sure, he knew precisely what he was doing. Nevertheless, his mental condition was not that of an ordinary drunk passenger. For this reason, we believe that the *via media* warrants departing upward to a net Offense Level 14,[19] which provides for a fifteen to twenty-one month period of incarceration.

Within *that* range, we believe that a sentence of eighteen months is on this record warranted. This term pays the added dividend of affording the Bureau of Prisons time to provide Spellman with the structured mental health treatment he so palpably needs.

### APPENDIX

The following cases are culled from those that consider prosecutions under 49 U.S.C. § 46504 or its predecessors. These cases describe the underlying factors with sufficient particularity as to make them helpful in defining what the heartland is for cases involving interference with flight attendants and other crew members.

*United States v. Meeker*, 527 F.2d 12 (9th Cir.1975)

*United States v. Figueroa*, 666 F.2d 1375 (11th Cir.1982)

*United States v. Henderson*, 680 F.2d 659 (9th Cir.1982)

*United States v. Hall*, 691 F.2d 48 (1st Cir.1982)

*United States v. Tabacca*, 924 F.2d 906 (9th Cir.1991)

*United States v. Mena*, 933 F.2d 19 (1st Cir.1991)

*United States v. Hicks*, 980 F.2d 963 (5th Cir.1992)

*United States v. Flores*, 968 F.2d 1366 (1st Cir.1992)

*United States v. Compton*, 5 F.3d 358 (9th Cir.1993)

*United States v. Jenny*, 7 F.3d 953 (10th Cir.1993)

*United States v. Ignagni*, No. 93–5049, 1993 WL 366463 (4th Cir. Sept.21, 1993)

*United States v. DeMichael*, No. 93–10157, 1993 WL 435587 (9th Cir. Oct.27, 1993)

*United States v. Patterson*, 20 F.3d 809 (10th Cir.1994)

*United States v. Vickaryous*, No. 95–1194, 1996 WL 2773 (10th Cir. Jan.4, 1996)

*United States v. Calloway*, 116 F.3d 1129 (6th Cir.1997)

*United States v. Grossman*, 131 F.3d 1449 (11th Cir.1997)

*United States v. Pelfrey*, No. 98–4403, 1998 WL 811781 (4th Cir. Nov.23, 1998)

*United States v. Kasper*, No. 98–50516, 1999 WL 1211483 (9th Cir. Dec.13, 1999)

*United States v. Bayes*, 210 F.3d 64 (1st Cir.2000)

*United States v. Poe*, No. 99–50090, 2000 WL 369506 (9th Cir. Apr.11, 2000)

---

**19.** By "net", we mean the final offense level after departing to a seventeen (from eleven), minus two for acceptance of responsibility and one for timeliness under U.S.S.G. § 3E1.1(b). Of course, we have employed the apparatus of departure because the parties and the probation officer all began with a base offense level (before multiple count adjustment) of nine for the interference count. We could have just as easily not accepted this consensus and applied § 2A5.2(a)(2) directly. Rather than parse this Guidelines Scholasticism any finer, however, we are content to note that, once again, the apparent mathematical rigor of the Guidelines' 258–range grid is belied by the reality of the pervasive metaphysic behind it, one in which the Schoolmen would surely have delighted.

**296**

*United States v. Guerrero*, 193 F.Supp.2d 607 (E.D.N.Y.2002)

### ORDER

AND NOW, this 4th day of February, 2003, upon consideration of the Government's motion for upward departure, and the defendant's motion for downward departure, and after a sentencing hearing yesterday, and upon the findings of fact and conclusions of law set forth in the accompanying memorandum, it is hereby ORDERED that:

1. The Government's motion is GRANTED; and

2. The defendant's motion is DENIED.