**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
              *Plaintiff-Appellee,*

v.

SALVADOR GONZALEZ,
              *Defendant-Appellant.*

No. 05-10543

D.C. No.
CR-03-00498-LDG

OPINION

Appeal from the United States District Court
for the District of Nevada
Lloyd D. George, District Judge, Presiding

Argued and Submitted
November 16, 2006—San Francisco, California

Filed July 3, 2007

Before: A. Wallace Tashima and M. Margaret McKeown,
Circuit Judges, and David A. Ezra,* District Judge.

Opinion by Judge McKeown;
Dissent by Judge Tashima

*The Honorable David A. Ezra, United States District Judge for the District of Hawaii, sitting by designation.

7949

## COUNSEL

Daniel G. Bogden, United States Attorney; Robert L. Ellman, Chief, Appellate Division; Thomas S. Dougherty, Assistant United States Attorney, Las Vegas, Nevada, for the defendant-appellant.

Franny A. Forsman, Federal Public Defender; Jason F. Carr, Assistant Federal Public Defender, Las Vegas, Nevada, for the plaintiff-appellee.

**OPINION**

McKEOWN, Circuit Judge:

Southwest Airlines Flight 2466, bound for Ontario, California, from Las Vegas, Nevada, had an uneventful takeoff. Before long, the cabin was in total chaos. Passenger Salvador Gonzalez became hysterical, demanded that the plane land, made statements about a bomb and, according to a flight attendant, said, "I'm blowing the plane up." The crew and passengers tried to subdue him. He eventually was handcuffed and the plane was diverted back to Las Vegas.

Gonzalez pled guilty to interference with a flight crew member in violation of 49 U.S.C. § 46504. He appeals the district court's decision to impose a nine-level sentencing enhancement for reckless endangerment of the aircraft under the advisory United States Sentencing Guidelines ("Guidelines"). We are unpersuaded by Gonzalez's argument that the enhancement is inapplicable. His conduct was a threat not only to crew and passengers but to the aircraft.

**BACKGROUND**

Shortly after take-off, Gonzalez, who was seated in the last row of the airplane, stood up, complained of heart problems, and requested oxygen from a flight attendant. Flight attendant Patrick Poulin informed Gonzalez that the captain would be notified and oxygen would be made available, but Gonzalez refused to sit down and walked up the aisle, demanding that the plane land.

Just as Poulin was retrieving an oxygen tank, flight attendant Nancy Castillo noticed Gonzalez in the aisle and thought he might need medical attention. As she approached, Gonzalez said that he was having a heart attack. Castillo tried to calm him down, but Gonzalez continued toward the front of

the plane, claiming that he needed a forward seat and asking that the plane, which had just taken off, land.

Gonzalez became increasingly agitated, saying: "We have to get on the ground. We need to land. I need to get this aircraft on the ground." To Castillo, Gonzalez appeared "very angry," and "very upset." Gonzalez then began opening overhead bins and attempted to take out the luggage. Castillo heard him say, "I have a bomb," and she ran up the aisle to inform the captain, who indicated that the plane would return to Las Vegas.

According to Castillo:

> The cabin was total chaos, everybody — the — right at the point when he had said "I have [a] bomb," I saw many of our male passengers unbuckle their seatbelts and they stood up and they — I remember seeing the people throwing punches and everybody, you know, they were all on top of Mr. Gonzalez. . . . [Gonzalez] was hysterical and he was swinging and kicking and he was just — he was hitting and kicking passengers and the passengers were trying to take him down and hold him down.

Castillo added that passengers were concerned Gonzalez would open the emergency exit door:

> Many of the female passengers were screaming and yelling and crying. The cabin was total chaos. They were yelling, "We're going to die. We're going to crash. We're going down." And a lot of the women were hysterical. They were — they were thinking we were going to crash. Thinking they — when the passengers heard Mr. Gonzalez say, "I have a bomb," and at that point it was just all hell broke loose.

Castillo recalled that as Gonzalez made his way toward the emergency exit row, women were screaming and saying,

"He's going to open up the door." Castillo, who was "very afraid," noted that the passengers were crying because they thought that if Gonzalez opened the emergency door, the aircraft was going down.

When Gonzalez began opening the overhead bins, another flight attendant, Kyle Woodard, who was on board but was not working the flight, became concerned. Woodard got up to see what was going on, and heard Poulin assuring Gonzalez that the plane was turning around to land in Las Vegas. Woodard heard Gonzalez say "something to the effect of, do I have to say I have a bomb to get this plane on the ground? Gonzalez went on to say, 'I can blow this plane up.' " Poulin's statement to the FBI was in accord with Woodard's version of events.

In the midst of the chaos, Woodard and Poulin tried to restrain Gonzalez by grabbing his arms. Woodard described the following interchange with Gonzalez:

> [Gonzalez] was — he looked at Patrick [Poulin] and looked at me, he said he — I have a [unintelligible] you're going to kill me or something. At that time I told him, I said, well, then let's calm down, we're going to let you go, let's, you know, bring this down, and he — we both released him and he said, "I want this plane on the ground." Patrick's saying, "Sir, we're going back to Vegas." And then finally he said something to the effect of, you know, f--- it, I'm blowing the plane up, I'm taking it down.

In response to a question whether Gonzalez "was going to take the plane down," Woodard testified, "I was afraid that he had a device or something [and that] it was going to do harm to myself and my crew and my passengers, yes."

Gonzalez then opened an overhead bin and began pulling out a bag, which set off a struggle during which Gonzalez

kicked Poulin. Several passengers assisted Poulin and Woo-dard in an attempt to restrain Gonzalez. During the course of this struggle he "hit several passengers with his arms and legs" and was "kicking everybody." Flight attendants and passengers were ultimately able to restrain Gonzalez with plastic handcuffs.

The plane was diverted and it returned to Las Vegas without further incident. FBI agents arrested Gonzalez, who told them that "he knew what he was doing was wrong but felt he had to do something to land the plane." At the change of plea hearing, Gonzalez acknowledged that, although he had used methamphetamine the day before the incident, he was aware of his actions and understood and knew what he was doing at the time of the incident. The precise statement that Gonzalez made about the bomb is in dispute. In the change of plea hearing, Gonzalez denied making the specific statement "I have a bomb," but admitted to stating, "what do I have to do to get this plane to land? Do I have to say I have a bomb?"

Gonzalez was indicted on one count of interference with a flight crew member in violation of 49 U.S.C. § 46504. To violate § 46504, a defendant's conduct of "assaulting or intimidating a flight crew member or flight attendant" must "interfere[ ] with the performance of the duties of the member or attendant or lessen[ ] the ability of the member or attendant to perform those duties." 49 U.S.C. § 46504. Although Gonzalez initially entered a plea of not guilty, he later changed his plea to guilty.

The Presentence Investigation Report ("PSR") recommended a nine-point base offense level enhancement (from 9 to 18) under United States Sentencing Guidelines § 2A5.2(a)(2) on the ground that Gonzalez recklessly endangered the safety of the aircraft. During the sentencing hearing, which took place over several sessions, the court heard testimony from flight attendants Nancy Castillo and Kyle Woo-

dard. Gonzalez disputed the claim that he had recklessly endangered the safety of an aircraft.

At the final hearing, the district court reviewed the procedural history of the case, summarized the parties' respective positions concerning the sentencing issues and reviewed the Guidelines calculations. The district judge stated, "[t]he court has considered all of the factors and the advisory guidelines in my judgment are twenty-one (21) to twenty-seven (27) months. I will impose a 27-month sentence on the defendant. I will require him to be supervised for three (3) years, and to pay the one hundred dollar ($100) special assessment." The district court did not apply the two-level enhancement for obstruction of justice but gave Gonzalez the benefit of a two-level downward adjustment for acceptance of responsibility. The district court also specified that the offense level was 16, meaning that it had applied the nine-level enhancement.

## ANALYSIS

The central issue on appeal is whether the nine-level Guideline enhancement for recklessly endangering the safety of an aircraft is applicable to Gonzalez's conduct. In addition, although he did not raise the standard of proof issue below, Gonzalez claims that reversal is warranted because the enhancement must be proven by clear and convincing evidence.

### I.   HISTORY OF U.S.S.G. § 2A5.2(a)(2)

Before the enactment of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA PATRIOT Act"), Pub. L. No. 107-56, 115 Stat. 272 (2001), § 2A5.2(a)(2) referred to recklessly endangering the safety of the "aircraft *and passengers*." U.S.S.G. § 2A5.2(a)(2) (2001) (emphasis added). Effective November 1, 2002, § 2A5.2(a)(2) was amended to refer to "endangering the safety of . . . an air-

port or an aircraft; or . . . a mass transportation facility, a mass transportation vehicle, or a ferry." U.S.S.G. § 2A5.2(a)(2)(2003).

The USA PATRIOT Act also led to the addition of a new subsection, § 2A5.2(b), relating to the use of dangerous weapons. According to the United States Sentencing Commission's stated reasons for the amendment, § 2A5.2(b) was added to "address[ ] concerns that the current base offense level of 18 (in § 2A5.2(a)(2)) for reckless endangerment may be inadequate in situations involving a dangerous weapon and reckless disregard for the safety of human life." U.S.S.G. Supp. to Append. C, amend. 637, at 247 (2002). Another new subsection, § 2A5.2(c), was added to "cross reference . . . the appropriate homicide guideline . . . for offenses in which death results." *Id.*

The overall effect of these amendments, taken together, is two-fold. First, it is now *easier* to invoke the sentence enhancements because § 2A5.2(a)(2) does not require a showing of endangerment to the passengers. For example, even if an individual threatened to blow up an empty aircraft, he could receive an enhancement under § 2A5.2(a)(2). And, in the case of an aircraft loaded with passengers, Congress reasonably assumed, as would most people, that endangering an aircraft would endanger the passengers. Second, to the extent reckless endangerment involves dangerous weapons or results in death, the overall penalties are now higher.

## II.  APPLICATION OF THE ADJUSTMENT UNDER U.S.S.G. § 2A5.2(a)(2)[1]

---

[1]Gonzalez's related argument that the sentence was unreasonable is premised on the contention that the district court improperly invoked the enhancement. We need not address this issue in light of our conclusion that Gonzalez's conduct falls within the range of conduct contemplated by the enhancement.

**[1]** The adjustment under § 2A5.2(a)(2) applies "if the offense involved recklessly endangering the safety of . . . an aircraft." U.S.S.G. § 2A5.2(a)(2). Gonzalez argues that the "crucial legal fulcrum," as he terms it, is whether he recklessly endangered the actual aircraft and that while he may have interfered with the crew and arguably even endangered passengers, the adjustment is inapplicable because he did not endanger an *aircraft*. In sum, he claims that he endangered only the flight crew and passengers, not the aircraft.

To the extent Gonzalez's point is that the adjustment requires conduct beyond the underlying offense, he is correct. Simply interfering with the flight crew is insufficient to warrant the nine-level enhancement. But Gonzalez's ultimate argument fails for two reasons: first, endangerment of the aircraft does not require evidence of *actual* harm to the aircraft; and second, Gonzalez's irresponsible statements, threats and conduct easily qualified as reckless endangerment to "the safety of . . . an aircraft" within the meaning of § 2A5.2(a)(2).

Turning to the first argument, not surprisingly, Gonzalez points to no case that requires evidence of actual harm to the aircraft under § 2A5.2(a)(2). Common sense tells us that a defendant can endanger something without causing actual harm. *See, e.g.*, *Price v. United States Navy*, 39 F.3d 1011, 1019 (9th Cir. 1994) ("Courts have . . . consistently held that 'endangerment' means a threatened or potential harm and does not require proof of actual harm.") (Resource Conservation and Recovery Act) (citations omitted); *Ethyl Corp. v. EPA*, 541 F.2d 1, 13 (D.C. Cir. 1976) ("Case law and dictionary definition agree that endanger means something less than actual harm.") (Clean Air Act).

Nothing suggests that this commonly-accepted meaning should not apply here. In a closely analogous situation, the district court explained:

> Defendant urges this court . . . to find that 2A5.2(a)(2) applies only if there is actual harm to the

aircraft and passengers. Such a construction would mean that this Base Offense Level would apply only when an aircraft actually crashed or suffered other damage as a result of a defendant's action. Had this been the intended meaning, the term 'harming' would have been more appropriate than endangering, which means 'putting someone or something in danger; exposing to peril or harm.'

*United States v. Guerrero*, 193 F. Supp. 2d 607, 608 (E.D.N.Y. 2002) (quoting Black's Law Dictionary 547 (7th ed. 1999)).

**[2]** Recognizing that actual harm to the aircraft is not required for behavior to constitute endangerment, we next consider the contours of "recklessly endangering the safety of . . . an aircraft." Section 2A5.2 does not define "reckless." However, Application Note 1 to U.S.S.G. § 2A1.4 defines the term "reckless" in the context of involuntary manslaughter as a situation in which the defendant "was aware of the risk created by his conduct and the risk was of such a nature and degree that to disregard that risk constituted a gross deviation from the standard of care that a reasonable person would exercise in such a situation." U.S.S.G. § 2A1.4, app. n.1. We adopted this definition in *United States v. Naghani*, 361 F.3d 1255, 1263 (9th Cir. 2004), a case that raised similar issues involving reckless endangerment of an aircraft.

In *Naghani*, the defendant entered the aircraft lavatory and lit a cigarette, which set off a smoke alarm. When confronted, he argued with a flight attendant and threatened to "kill all Americans." *Id.* at 1260. Although Naghani denied making this statement or refusing to cooperate, the jury convicted him of interfering with the duties of a flight crew in violation of 49 U.S.C. § 46504. The district court imposed the enhancement under § 2A5.2(a)(2). In upholding the enhancement, we observed:

> The district court found that Naghani had acted reck-
> lessly based on the entire course of Naghani's
> alleged conduct. The district court properly found
> that Naghani was aware of the risk created by his
> smoking, obstreperous behavior and threats, and that
> such conduct constituted a gross deviation from a
> standard of ordinary care. Naghani should have been
> aware that his behavior would divert the flight atten-
> dants' attention from their duties and require their
> presence. *If an actual emergency had arisen at*
> *another part of the plane, the distraction would have*
> *delayed, and perhaps prevented, an effective*
> *response by the flight attendants.*

*Id.* at 1263 (emphasis added).[2]

The Tenth Circuit's treatment of § 2A5.2(a)(2) is consistent with our analysis. *See United States v. Jenny*, 7 F.3d 953 (10th Cir. 1993). In *Jenny*, the defendant was convicted of intimidating a flight crew under 49 U.S.C. § 1472(j), the predecessor statute to 49 U.S.C. § 46504. The district court applied a base offense level of 18 under § 2A5.2(a)(2). *Id.* at 954. Jenny cursed at the flight attendant and other passengers, made sexually suggestive remarks and gestures, grabbed a female flight attendant's breast and a female passenger's arm, and approached the cockpit area and sat in the flight attendant's jump seat, among other things. *Id.* at 954-55. The captain was forced to make an unscheduled landing due to

---

[2]We cannot embrace the dissent's suggestion that *Naghani* is "not binding because the court [in *Naghani*] did not consider the meaning of 'aircraft' or what level of interference satisfied the Guideline," or that its analysis is dicta. Dissenting op. at 7971-72. *Naghani* squarely addressed the question presented here—i.e., whether the district court's application of § 2A5.2(a)(2) was an abuse of discretion. Under the Guidelines in effect at sentencing, the government was required to show that Naghani had endangered *both* "the aircraft and passengers." *See* U.S.S.G. § 2A5.2(a)(2) (2001). That the court did not parse the meaning of aircraft or that its analysis relating to § 2A5.2 was brief, does not render its conclusion dicta.

Jenny's conduct. *Id.* at 955. The court affirmed the sentencing enhancement under § 2A5.2(a)(2), holding that Jenny "acted with an awareness to forseeable consequence." *Id.* at 957.

Two district court cases are also particularly instructive. In *Guerrero*, the court held that the enhancement applied when an intoxicated passenger was so unruly that the captain concluded that he must return to John F. Kennedy International Airport rather than continue on to Santo Domingo, Dominican Republic. 193 F. Supp. 2d at 609-10. The passenger's behavior included shoving, hitting, sexual touching, and threats that he was going to kill everyone on the aircraft. *Id.* at 610. The pilot left his duties in the cockpit to deal with the passenger, and the aircraft had to be turned around and returned to New York.**³** *Id.* The court held that these actions exposed the aircraft and passengers to harm within the meaning of the Guidelines.

In the second case, *United States v. Spellman*, 243 F. Supp. 2d 285 (E.D. Pa. 2003), the court held that it could have applied the reckless endangerment enhancement, but did not do so because the parties had stipulated to a base offense level of nine. *Id.* at 295 n.19. During the flight, Alonzo Spellman, a former defensive end for the Chicago Bears, was extremely abusive and threatening to the flight attendants and fellow passengers, and made comments like, "I hope we make it to Philadelphia before this plane crashes into a building." *Id.* at 287. He also "talked out loud about opening the door while in flight" and said to the flight crew, "Give me a parachute and I'll jump off this plane." *Id.* After multiple failed attempts by the captain, flight attendants and passengers to restrain

---

**³**Of course it is not necessary for the pilot to leave the cockpit to address a crisis, thus diverting his attention. Here, the pilot's ordinary flight routine was seriously disrupted when an alarmed flight attendant alerted him to the bomb threats and the fracas in the cabin. Given the increased security measures and policies in effect post-9/11, it may well have been imprudent for the pilot to have left the cockpit under the circumstances.

Spellman, the pilot requested a priority handling that allowed the plane to land early at the Philadelphia airport. *See id.* at 288. The district court found that Spellman created an atmosphere of "pervasive terror." *Id.* at 294. As the court summarized:

> In typical prosecutions under Sections 1472(j) and 46504, the defendants insult, physically harass, and in some cases even threaten to kill flight personnel. However, it is the rare case in which passengers experience the degree of fear and intimidation that Spellman instilled in so many of his fellow passengers. *Indeed, we found few cases in which the passengers had serious grounds to worry that the offender would actually bring down the plane.*

*Id.* at 293 & n.13 (collecting cases) (emphasis added).

**[3]** As these cases illustrate, diversion of the aircraft, behavior that instills fear and terror in the other passengers or the flight crew, and threats that could result in harm to the aircraft are sufficient, depending on the combination of circumstances, to constitute reckless endangerment of the safety of the aircraft. Gonzalez's conduct encompassed these risks and more.

**[4]** To be sure, simply disrupting the flight attendants and causing other passengers discomfort does not rise to the level of reckless endangerment. But Gonzalez's statements about the bomb were no joking matter. Surely threats about a bomb —whether couched in terms of "do I have to say I have a bomb?" or "I'm blowing the plane up, I'm taking it down"— go beyond interference with the flight crew's performance of duties and constitute "a gross deviation from the standard of care that a reasonable person would exercise in such a situation." U.S.S.G. § 2A1.4, app. n.1. The passengers were yelling, "[w]e're going to crash. We're going down." The air of

terror created by Gonzalez, who candidly admitted he knew what he was doing, was reckless in the extreme.

**[5]** Gonzalez's argument that his conduct—whatever its impact on the flight crew and passengers—does not amount to endangerment of the *aircraft*, misses the mark because his conduct endangered both the people and the aircraft itself. An aircraft is a captive, closed environment in which the safety of the passengers and the integrity of the aircraft are closely intertwined. It doesn't take an aeronautical engineer to recognize that a threat of a bomb in that environment and the havoc that such a threat might cause is a threat to the safety of the aircraft. Nowhere in § 2A5.2(a)(2) is there a requirement that an *actual* weapon or bomb be found on the plane. Such a narrow interpretation would remove highly reckless and threatening conduct from the ambit of § 2A5.2(a)(2), a result that makes no common sense.

**[6]** And finally, as occurred in both *Guerrero* and *Spellman*, Gonzalez's conduct precipitated an emergency diversion of the aircraft and a return to Las Vegas. This diversion was yet another risk to the aircraft caused by Gonzalez's escalating terror.[4]

The chaos engendered by Gonzalez goes far beyond his characterization of a threat solely to the safety of the crew and passengers. Their ultimate safety is inextricably bound with the safety of the aircraft but we need not decide whether a

---

[4]The dissent's statement that "the more reasonable inference [regarding the aircraft's diversion] would seem to be that . . . the pilot concluded that it would be *safer* to return to Las Vegas, rather than continue on to Ontario, California," dissenting op. at 7971, can only be described as a logical fallacy. The pilot apparently considered a diversion of the aircraft back to Las Vegas, even under emergency, distress situations, to be safer than proceeding to Ontario once Gonzalez threatened to bring down the plane. But such diversion was certainly not safer than the normal operation of the flight to Ontario in the absence of Gonzalez's disruptive behavior and threats.

threat solely to the passengers would be sufficient to invoke the enhancement. Gonzalez recklessly endangered the aircraft itself. He does not present the case of a drunken passenger who tips over the drink cart, harasses a flight attendant, threatens a passenger, or is simply obstreperous. The enhancement requires more and Gonzalez's behavior easily falls within the contours of "recklessly endangering the safety of . . . an aircraft." U.S.S.G. § 2A5.2(a)(2).

## III.   STANDARD OF PROOF FOR RECKLESS ENDANGERMENT

Section 2A5.2 provides for a base offense level of nine for the statute of conviction, 49 U.S.C. § 46504. U.S.S.G. § 2A5.2(a)(4). However, "if the offense involved recklessly endangering the safety of . . . an aircraft," the base offense level is 18. U.S.S.G. § 2A5.2(a)(2). Gonzalez argues that the enhancement must be supported by clear and convincing evidence.

[7] As a general rule, the party seeking to adjust an offense level must establish by a preponderance of the evidence that the adjustment is merited. *See United States v. Charlesworth*, 217 F.3d 1155, 1158 (9th Cir. 2000). However, a sentencing factor that has "an extremely disproportionate effect on the sentence relative to the offense of conviction" may require a district court to find that factor by clear and convincing evidence, rather than by a preponderance of the evidence. *See United States v. Munoz*, 233 F.3d at 1117, 1127 (9th Cir. 2000).[5]

Although we conclude that the heightened standard is appropriate here, we review for plain error because Gonzalez did not raise this argument before the district court. *United States v. Bahe*, 201 F.3d 1124, 1127 (9th Cir. 2000). "Plain error is found only where there is (1) error, (2) that was clear

---

[5]Post-*Booker*, these same standards remain applicable. *See United States v. Kilby*, 443 F.3d 1135, 1140-41 & n.1 (9th Cir. 2006); *see also United States v. Staten*, 466 F.3d 708, 717 (9th Cir. 2006).

or obvious, (3) that affected substantial rights, and (4) that seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *Id.* (citation and quotation marks omitted); *see United States v. Jordan*, 256 F.3d 922, 926 (9th Cir. 2001) (applying plain error standard to a case where defendant failed to object to application of preponderance of the evidence standard at sentencing).

**[8]** To assess whether the heightened standard of proof applies, we review the totality of the circumstances, *United States v. Dare*, 425 F.3d 634, 642 (9th Cir. 2005), including the following factors:

   1.   Does the enhanced sentence fall within the maximum sentence for the crime alleged in the indictment?

   2.   Does the enhanced sentence negate the presumption of innocence or the prosecution's burden of proof for the crime alleged in the indictment?

   3.   Do the facts offered in support of the enhancement create new offenses requiring separate punishment?

   4.   Is the increase in sentence based on the extent of a conspiracy?

   5.   Is the increase in the number of offense levels less than or equal to four?

   6.   Is the length of the enhanced sentence more than double the length of the sentence authorized by the initial sentencing guideline range in a case where the defendant would otherwise have received a relatively short sentence?

*United States v. Johansson*, 249 F.3d 848, 854 (9th Cir. 2001) (citation omitted) (quoting *United States v. Valensia*, 222 F.3d 1173, 1182 (9th Cir. 2000), *cert. granted and judgment vacated on other grounds*, 532 U.S. 901 (2001)). No single factor is controlling. *Dare*, 425 F.3d at 642.

**[9]** Although the first four factors are either not particularly relevant or do not weigh in favor of a heightened standard, the last two factors are significant. In *Jordan* we concluded that a nine-level enhancement, which we have here, "strongly supports application of the clear and convincing evidence standard." *Jordan*, 256 F.3d at 929. The offense level increase, the fifth factor, weighs heavily in favor of a heightened burden. The sixth factor, whether the length of the enhanced sentence is more than double the length of the sentence authorized by the initial Guideline range in a case where the defendant would otherwise have received a relatively short sentence, likewise counts in Gonzalez's favor. The nine-level enhancement raised the applicable Guideline range from zero to six months (where probation is a viable option) to 21 to 27 months, which is more than four times the upper end of the Guideline range.

**[10]** We have previously invoked the clear and convincing evidence standard where only the two final factors favor its application, and nothing suggests that we should take a different approach here. *See Jordan*, 256 F.3d at 929 (holding that heightened standard should have been applied when the sentence was more than doubled). *See also id.* at 934 (O'Scannlain, J., concurring) ("Since *Hopper*, we appear to have consistently held that when the enhancement is greater than four levels and more than doubles the applicable sentencing range, then the enhancements must be proved under the 'clear and convincing' standard of proof." (collecting cases)).

**[11]** The district court did not specify the standard of proof nor did Gonzalez's counsel raise the issue. Gonzalez is not entitled to reversal, however, simply because the district court

should have applied the clear and convincing standard. The failure to articulate the standard did not prejudice Gonzalez. As we explained in *Jordan*:

> An error that is plain must also 'affect substantial rights.' In most cases this language means that 'the error must have been prejudicial: It must have affected the outcome of the district court proceedings.' . . . Jordan therefore must make a specific showing of prejudice to satisfy this prong. However, it is evident beyond doubt that Jordan's increased incarceration caused by the challenged enhancements is prejudicial *if these enhancements could not have been proved by clear and convincing evidence*.

256 F.3d at 930 (emphasis added). *See also United States v. Technic Servs.*, 314 F.3d 1031, 1046 (9th Cir. 2002) (holding on plain error review that the record reflected the court found the enhancements by clear and convincing evidence, based on certain statements the judge made).

[12] Because the evidence in this case was overwhelming, it is evident that the facts related to the enhancement were established by clear and convincing evidence. The dispute over Gonzalez's language with respect to the bomb does not change the calculus. Even accepting Gonzalez's version, coupled with the uncontroverted testimony of the flight attendants and other aspects of Gonzalez's behavior, the standard is easily met.

**AFFIRMED.**

---

TASHIMA, Circuit Judge, dissenting:

Gonzalez was convicted, on a plea of guilty, of one count of interference with a flight crew member in violation of 49

U.S.C. § 46504. Accepting the recommendation of the Proba-
tion Officer, the district court doubled Gonzalez's base
offense level — from level 9 to level 18 — for recklessly
endangering the safety of the aircraft under U.S.S.G.
§ 2A5.2(a)(2) without making any specific finding of fact that
the safety of the aircraft was, indeed, endangered. Because I
disagree that this enhancement is applicable in this case, I
respectfully dissent.

Even reading the sentencing record and all of the materials
available to the district court at sentencing in the light most
favorable to upholding the sentence, the record does not come
close to establishing that Gonzalez posed any threat to the *air-
craft* in this case. Based on the plain meaning of
§ 2A5.2(a)(2), whether or not Gonzalez's conduct threatened
the flight attendants and passengers is a separate question, to
which this enhancement does not speak. The majority mis-
takenly conflates the two concepts — threat or endangerment
of a flight attendant and endangerment of the aircraft. Accep-
tance of the majority's reasoning would render the enhance-
ment under § 2A5.2(a)(2) applicable to virtually every case
for violation of 49 U.S.C. § 46504. This is contrary to the
Guideline's unambiguous language and the clear intent of the
Sentencing Commission.

"This Court applies the rules of statutory construction when
interpreting the Sentencing Guidelines. . . . If the language of
a statute is unambiguous, the plain meaning controls." *United
States v. Robinson*, 94 F.3d 1325, 1328 (9th Cir. 1996); *see
also United States v. Carter*, 421 F.3d 909, 911-12 (9th Cir.
2005) (examining the meaning of U.S.S.G. § 2K2.1(b)(4)
according to the rules of statutory construction). In assessing
plain meaning, " 'unless otherwise defined, words will be
interpreted as taking their ordinary, contemporary, common
meaning.' " *Carter*, 421 F.3d at 911 (quoting *Perrin v. United
States*, 444 U.S. 37, 42 (1979)).

As applicable here, § 2A5.2(a)(2) calls for an enhancement
"if the offense [of interference with a flight crew member or

flight attendant] involved recklessly endangering the safety of
. . . *an airport or an aircraft*." U.S.S.G. § 2A5.2(a)(2)
(emphasis added). To take a typical definition, an "aircraft" is
"a weight-carrying machine or structure for flight in or navi-
gation of the air." Webster's Third New International Dictio-
nary (Unabridged) 46 (2002).

The majority improperly disregards the plain meaning of
"aircraft" and includes "flight attendants and passengers"
within the meaning of "aircraft."[1] Under the majority's read-
ing, no risk or endangerment to the aircraft itself or any of its
components need be present in order for § 2A5.2(a)(2) to
apply. The facts in this case vividly illustrate why the majori-
ty's interpretation of the Guideline is untenable, notwithstand-
ing its unsupported and bald assertion that "Gonzalez's
irresponsible statements, threats and conduct easily qualified
as reckless endangerment to 'the safety of . . . an aircraft'
within the meaning of § 2A5.2(a)(2)." Maj. op. at 7959.[2]

In this case, there was no bomb on the plane, and there is
no evidence that Gonzalez's empty (and empty-handed), pan-
icked threat endangered the safety of the machine or structure
composing the "aircraft." Contrary to the majority's sugges-
tion, the fact that flight attendants and passengers were dis-

---

[1]The majority concludes that "endangerment of the aircraft does not
require evidence of *actual* harm to the aircraft." Maj. op. at 7959 (empha-
sis in original). I do not dispute the majority's point that one can endanger
an object without causing it actual harm. *See Price v. United States Navy*,
39 F.3d 1011, 1019 (9th Cir. 1994); *Ethyl Corp. v. EPA*, 541 F.2d 1, 13
(D.C. Cir. 1976). However, the object of the endangerment under U.S.S.G.
§ 2A5.2(a)(2) must still be the *aircraft*, meaning the machine involved, as
opposed to the flight attendants, which was not shown in this case.

[2]The burden of proof is on the party seeking to adjust an offense level
to establish by a preponderance of the evidence that the adjustment is mer-
ited. *United States v. Charlesworth*, 217 F.3d 1155, 1157-58 (9th Cir.
2000); *United States v. Barnes*, 993 F.2d 680, 683 (9th Cir. 1993). Having
failed to make an adequate record at sentencing, as discussed below, the
government clearly did not meet its burden here, contrary to the holding
of the majority.

turbed, even panicked, and the plane was turned around is insufficient to meet the Guideline.[3] There was no evidence presented in this case, through testimony from the pilot or otherwise, that the pilot's ability effectively to operate the plane was inhibited, or that the diversion caused any risk to aircraft safety. Also lacking any evidence that the return of the aircraft to Las Vegas precipitated any danger, moreover, this case is distinguishable from the cases upon which the majority relies.[4]

Most importantly, the majority improperly relies on *United States v. Naghani*, 361 F.3d 1255 (9th Cir. 2004). Contrary to the majority, I do not believe that *Naghani* controls and I conclude that what constitutes endangerment of the *aircraft* is an open question. First, *Naghani* is not binding because the court did not consider the meaning of "aircraft" or what level of

---

[3]The majority asserts that the "diversion of the aircraft and a return to Las Vegas" "was yet another risk to the aircraft caused by Gonzalez's escalating terror." Maj. op. at 7964. But the majority does not explain how this decision and maneuver endangered the *aircraft*, unless returning to Las Vegas is, for some unexplained reason, more dangerous to aircraft safety than continuing on to Ontario, California. Absent a further explanation, and there is none in the record, the more reasonable inference would seem to be that, because this incident happened "[s]hortly after take-off," Maj. op. at 7953, the pilot concluded that it would be *safer* to return to Las Vegas, rather than to continue on to Ontario. In any event, the majority's weak retort that "such diversion was certainly *not safer* than the normal operation of the flight to Ontario," *id.* at 7964 n.4 (emphasis added), is a far cry from establishing that such "diversion" *endangered* the aircraft.

[4]Even if the government were correct that a threat alone can endanger the safety of an aircraft (*i.e.*, without any weapon or bomb needing to be present), one would still need a causal connection between the threat and actual endangerment — to the mechanics or structure of an aircraft — before the enhancement could apply. The district court did not make any factual findings about endangerment to the aircraft, and the only testimony from flight attendants indicated fear for themselves and passengers on the plane, and the passengers' fear about the emergency exit door being opened. Notably, the feared opening of the emergency exit door was shown to be a nullity because there was testimony at the sentencing hearing that it is impossible to open a door in flight.

interference satisfied the Guideline. These questions were never squarely raised. Instead, the briefing was geared towards the question of what constituted reckless conduct, and there is no indication that the court contemplated the issues addressed here, namely the definition of "aircraft" or the specific meaning of that enhancement. *See Local 144 Nursing Home Pension Fund v. Demisay*, 508 U.S. 581, 592 (1993) (characterizing as dicta writings that were "uninvited, unargued, and unnecessary to the Court's holdings"). Accordingly, *Naghani* is not instructive, much less controlling.

Under the majority's interpretation of *Naghani*, moreover, the enhancement would apply in virtually every case of interfering with a flight attendant, rendering the distinction that the Guideline draws meaningless. The court there stated that "[i]f an actual emergency had arisen at another part of the plane, the distraction [based on the defendant's conduct] would have delayed, and perhaps prevented, an effective response by the flight attendants."[5] *Naghani*, 361 F.3d at 1263. Under this logic, any interference with a flight attendant endangers the aircraft itself. If this were true, no enhancement would be necessary because the utmost punishment would be implied in the offense of conviction, as the majority seems to hold.[6]

---

[5]It would be pointless to speculate what sort of "actual emergency" a flight attendant would be responsible for responding to, except to note that a flight attendant has no responsibility for the safe operation of the aircraft. That is the responsibility of the flight deck crew.

[6]To the contrary, to date, it appears to have been undisputed that endangering the safety of an aircraft was not an element of a violation of 49 U.S.C. § 46504. To this end, it is important to note that the actual language of 49 U.S.C. § 46504, governing "interference with flight crew members and attendants," covers "*lessen[ing] the ability of the member or attendant to perform*" his or her duties. 49 U.S.C. § 46504 (emphasis added). Clearly, the statute thereby takes into account the lessening of a flight attendant's ability to ensure the safety of the aircraft. *See United States v. Meeker*, 527 F.2d 12, 14 n.2 (9th Cir. 1975) ("We feel . . . that when a defendant participates in proscribed conduct and causes a crew member to lose his autonomy over doing what would ordinarily be his

For this reason, the dicta in *Naghani* (and the majority's reliance on it) is suspect because criminal liability and punishment may only be imposed when the operative language of the statute or Guideline at issue clearly dictates that result. *See Rewis v. United States*, 401 U.S. 808, 812 (1971) ("[A]mbiguity concerning the ambit of criminal statutes should be resolved in favor of lenity."); *Bifulco v. United States*, 447 U.S. 381, 387 (1980) ("This policy of lenity means that the Court will not interpret a federal criminal statute so as to increase the penalty that it places on an individual when such an interpretation can be based on no more than a guess as to what Congress intended.") (citations and quotation marks omitted). It is well-established that "one 'is not to be subjected to a penalty unless the words of the statute *plainly impose it*.'" *United States v. Campos-Serrano*, 404 U.S. 293, 297 (1971) (emphasis added); *see also United States v. Karaouni*, 379 F.3d 1139, 1143 (9th Cir. 2004) (same). Such is not the situation here.

Even if *Naghani* controls on this issue, the evidence presented in that case *was* sufficient to suggest that the *aircraft* was endangered, whereas it was not sufficient to establish such endangerment in this case. Where Naghani lit a cigarette, creating smoke, and then flushed the cigarette down the toilet, one could more reasonably conclude that the aircraft itself was endangered (by the danger of fire). *See Naghani*, 361 F.3d at 1258.

*United States v. Guerrero*, 193 F. Supp. 2d 607 (E.D.N.Y. 2002), similarly presented a case much more favorable to the

---

duty, a violation of section 1472(j) has occurred."); *United States v. Flores*, 968 F.2d 1366, 1371 (1st Cir. 1992); *United States v. Tabacca*, 924 F.2d 906, 911 (9th Cir. 1991). Accordingly, *Naghani*'s dicta is itself contrary to previous decisions of this court, insofar as it read the satisfaction of the elements of 49 U.S.C. § 46504 itself as warranting the enhancement.

application of the enhancement. In that case, the record disclosed:

> Captain Williams testified that he had to leave the cockpit to deal with the defendant, when he learned from the flight attendant that she could not handle the situation herself. Captain Williams testified that this increased the risk to the safety of the aircraft, which is designed to be flown by two pilots. Defendant further endangered the aircraft and passengers when he pushed Captain Williams, because this exposed the aircraft and crew to the danger of having their captain incapacitated. Not only did Captain Williams testify that he thought defendant was making the flight unsafe, but his actions confirm that he believed that defendant was endangering the aircraft and passengers. Captain Williams testified that he only left the cockpit when he concluded there was a potential danger to the aircraft, and, upon returning to the cockpit, Captain Williams turned the aircraft around and returned to New York City because he concluded that it was unsafe to continue on to Santo Domingo.

*Id.* at 609-10.

*United States v. Jenny*, 7 F.3d 953 (10th Cir. 1993), is also distinguishable because the captain left the cockpit to attend to the defendant's inappropriate behavior. *Id.* at 955. Moreover, the court in *Jenny* was concerned with the definition of "reckless" and did not engage in defining the precise scope of what needed to be endangered in order for the enhancement to apply. *See id.* at 955-57. The facts also distinguish this case from *United States v. Spellman*, 243 F. Supp. 2d 285 (E.D. Pa. 2003), where the pilot testified that there were additional risks and that there was " 'no tolerance for error' " in the landing

that he was caused to execute due to the defendant's inappropriate conduct. *Id.* at 288.[7]

All of the out-of-Circuit cases relied on by the majority — *Jenny*, *Guerrero*, and *Spellman* — share a common characteristic that is lacking in this case. In all of them, the pilot left the flight deck — the cockpit — to confront the unruly passenger in the passenger compartment. Here, by contrast, the pilot did not leave the cockpit; Gonzalez did not interact with the flight crew at all. In this regard, it is important to note that the FAA regulations requiring that cockpit doors be reinforced to thwart a September 11-like unauthorized entry of a passenger into the cockpit were already in place well before the date of this incident. *See* Flightcrew Compartment Access and Door Designs, 67 Fed. Reg. 2112, 2114 (Jan. 15, 2002). As we know from the history of United Flight 93 on September 11, 2001, it is control of the cockpit that determines, to a large degree, the safety of the aircraft and it is in response to those events that the new regulations requiring the strengthening of flight deck doors and locks was promulgated.[8] *See id.*

---

[7]The majority relies on these cases to state that "diversion of the aircraft, behavior that instills fear and terror in the other passengers or the flight crew, and threats that could result in harm to the aircraft are sufficient, depending on the combination of circumstances, to constitute reckless endangerment of the safety of the aircraft." Maj. op. at 7963. However, there is no evidence in this case that diversion of the aircraft endangered the aircraft, and making passengers (and even the flight crew) fearful and empty threats that cannot be carried out can scarcely be said to endanger the *aircraft* any more than interference with flight attendants *alone* does, under 49 U.S.C. § 46504. Tellingly, the majority immediately acknowledges that "simply disrupting the flight attendants and causing other passengers discomfort does not rise to the level of reckless endangerment." Maj. op. at 7963. What the majority fails to acknowledge, and a reason I dissent, is that this is the only kind of finding the evidence here supports.

[8]Because Gonzalez did not interact with the flight crew, the question of whether his conduct could have been properly construed as reckless is also an open one, because there is no indication that he "was aware of the risk created by his conduct" to the *aircraft. See Naghani*, 361 F.3d at 1263

In this case, control of the cockpit or safety of the flight crew was never endangered.

The majority speculates that the pilot's flight routine was "seriously disrupted." Maj. op. at 7962 n.3. But, again, there is no evidence of how serious any disruption may have been and whether such disruption endangered the safety of the aircraft. Indeed, the majority's concession that "it may well have been imprudent for the pilot to have left the cockpit under the circumstances," *id.*, is a virtual admission that, because the flight crew remained securely in the cockpit, the aircraft was not endangered.

Gonzalez's position is further strengthened by the fact that the cases the majority cites are not the only cases where circumstances favorable to the application of the enhancement have appeared. *See, e.g.*, *United States v. Vickaryous*, 1996 WL 2773 at *1-*2 (10th Cir. 1996) (applying enhancement under § 2A5.2(a)(2) where the defendant struck the pilot in the jaw, causing him to have severe difficulties performing his duties, including requiring assistance for an emergency landing); *United States v. Bocook*, 1995 WL 371250 (4th Cir. 1995) (per curiam) (affirming enhancement under

(applying definition of reckless from U.S.S.G. § 2A1.4 to § 2A5.2); U.S.S.G. § 2A1.4, Application Note 1. Notably, too, the government could easily have attempted to meet its burden by presenting the testimony of the pilot that his performance was affected or that he believed the aircraft was in danger, or any other evidence that the *aircraft* was endangered. The government failed to do so. Thus, the majority's statements about Gonzalez's general recklessness, Maj. op. at 7964-65, are inapposite because any such recklessness did not endanger the safety of the *aircraft*. The majority also states that "[i]t doesn't take an aeronautical engineer to recognize that a threat of a bomb in [an aircraft] environment and the havoc that such a threat *might cause* is a threat to the safety of the aircraft." Maj. op. at 7964 (emphasis added). Although I fail to follow the logic of this assertion, its emphasis on "might cause" renders the speculation superfluous. Significantly, the actualization of such potential is what should have been proven in order to prove endangerment to the safety of the aircraft. It was not.

§ 2A5.2(a)(1), dealing with intentional rather than reckless endangerment, where the defendant pretended to be an air traffic controller and gave false statements to pilots, including as they were attempting to land). Gonzalez's situation was quite different from these cases, and I believe these distinctions should guide our decision here.

Even if one looks beyond the plain meaning of the Guideline, the history of this enhancement also supports Gonzalez's position. Before 2002, as the majority mentions, the enhancement applied to reckless endangerment of "an aircraft *and passengers*." *See, e.g.*, U.S.S.G. § 2A5.2 (2001) (emphasis added). The deletion of the requirement that passengers be endangered, and the alteration of this enhancement to apply to "an airport or an aircraft," show that this enhancement — at the time Gonzalez was sentenced — was geared solely towards punishing conduct that endangers objects, not people. *See* U.S.S.G. Supplement to Append. C, amend. 637, at 234. This change was accompanied by enhanced penalties for assault and other dangers to people that may attend these crimes. Given these other provisions, it is all the more clear that Gonzalez's conduct did not come within the meaning of this enhancement. The overall penalties provided by the amendment were higher than before, moreover, so reading the enhancement according to its plain meaning seems quite consistent with Congress' intent.[9]

---

[9]The commentary to the 2002 amendment recognized concern that the base offense level provided in U.S.S.G. § 2A5.2(a)(2) was inadequate in situations involving a dangerous weapon and reckless disregard for the safety of human life. *See* U.S.S.G. Supplement to Append. C, amend. 637, at 247. To sanction conduct involving mortal peril, accordingly, the Sentencing Commission supplemented the Guideline to provide for a minimum offense level of 24. *See id.*; U.S.S.G. § 2A5.2(b)(1) (2002). The commentary also indicated that the Commission was becoming more concerned with threats to mass transportation systems and facilities, *see* U.S.S.G. Supplement to Append. C, amend. 637, at 247, which is consistent with my reading of the Guideline.

Because the aircraft-endangering enhancement should not apply if there is nothing more than interfering with flight attendants and potentially harming them and passengers, it was wrongfully applied in this case. Accordingly, I would vacate the sentence and remand this case to the district court. *See, e.g.*, *United States v. Kilby*, 443 F.3d 1135, 1140 (9th Cir. 2006) ("If there was material error in the Guidelines calculation, we will remand for resentencing . . . ."); *United States v. Menyweather*, 431 F.3d 692, 696-97 (9th Cir. 2005) ("[I]f the sentence imposed resulted from an incorrect application of

---

Moreover, the previous iteration of the Guideline shows that the Sentencing Commission clearly understood aircraft and flight attendant / passenger safety as distinct concepts. This fact further supports Gonzalez's claim that the meaning of "aircraft" is unambiguous and does not include flight attendants and passengers. *See* U.S.S.G. Supplement to Append. C, amend. 637, at 234. Moreover, as Gonzalez suggests, the structure of U.S.S.G. § 2A5.2 — even disregarding the fact of the amendment — intimates that the Guideline does not equate endangering a flight attendant with endangering the aircraft, because it provides a separate cross-reference to assault Guidelines when resort to assault Guidelines would result in a higher base offense level. *See* U.S.S.G. § 2A5.2(a)(3).

Thus, the majority misreads the effects of the amendments, and misapplies their implications to this case. *See* Maj. op. at 7958. That is, the majority writes that "it is now *easier* to invoke the sentence enhancements because § 2A5.2(a)(2) does not require a showing of endangerment to the passengers." Maj. op. at 7958 (emphasis in original). However, endangerment of passengers is not relevant in this case. The question here is endangerment of the safety of the *aircraft*. The majority also misunderstands the enhancement when it states, as an example, that "even if an individual threatened to blow up an empty aircraft, he could receive an enhancement under § 2A5.2(a)(2)." This should not be the case, because a *threat* to blow up an aircraft *does not endanger the aircraft*. Even if, moreover, "in the case of an aircraft loaded with passengers, Congress reasonably assumed, as would most people, that endangering an aircraft would endanger the passengers," *that is not what the Guideline references*. Congress referred to endangerment of the *aircraft* as what was required, and whether or not Congress intended to protect passengers through the application of this enhancement, *Congress did not use language that referred to passengers in its test*.

the Sentencing Guidelines, and the error was not harmless, ordinarily we will remand to the district court for further sentencing proceedings, permitting the district court on remand to consider the proper Guidelines sentence along with other sentencing factors").[10]

In sum, this case was simply a case of interfering with a flight attendant, and applying the enhancement under U.S.S.G. § 2A5.2(a)(2) here is tantamount to saying that it applies in virtually any case under 49 U.S.C. § 46504. The sentence imposed on Gonzalez was unreasonable because the district court miscalculated the applicable Guidelines range; consequently, I would reverse and remand for resentencing. For all of these reasons, I respectfully dissent.

---

[10]Even if the enhancement could have applied to Gonzalez, he was surely prejudiced because the enhancement was not proven by clear and convincing evidence — to which end I note the glaring absence of any testimony about danger to the safety of the *aircraft*. *See, e.g.*, *United States v. Jordan*, 256 F.3d 922, 930 (9th Cir. 2001) ("[I]t is evident beyond doubt that Jordan's increased incarceration caused by the challenged enhancements is prejudicial if these enhancements could not have been proved by clear and convincing evidence."). Gonzalez also convincingly argues that it is possible that the district court based its finding on a belief that Gonzalez recklessly endangered *only* the flight attendants and/or passengers. The government made an argument that could be read to this effect, namely when it said that it was "first addressing the issue whether or not the defendant was — had recklessly endangered *other passengers['] lives on the airplane*." There is nothing in the record to indicate that the district court did not share the same misapprehension of the Guideline, particularly in light of its failure to make any findings on this issue, and this fact also counsels in favor of remand.